**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SORENSON COMMUNICATIONS, INC., *et al.*,[1] | ) Case No. 14-10454 ([___]) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF SCOTT SORENSEN IN SUPPORT OF FIRST DAY MOTIONS**

I, Scott Sorensen, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer and a Director of Sorenson Communications, Inc., a corporation organized under the laws of Utah, and of each of the other above-captioned debtors (collectively, the *"Debtors"*).[2] I have served the Debtors in my current capacity since 2007.   In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.     Except as otherwise indicated herein, all facts set forth in this declaration (this *"Declaration"*) are based on my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents, or information supplied to me by other members of the Debtors' management and the Debtors' advisors.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]   The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Sorenson Communications, Inc. (0555); Allied Communications, Inc. (3611); CaptionCall, LLC (9444); SCI Holdings, Inc. (9815); Sorenson Communications Holdings, LLC (9866); Sorenson Communications of Canada, ULC (9719); and Sorenson Holdings, Inc. (0427).  For the purpose of these chapter 11 cases, the service address for the Debtors is:  4192 South Riverboat Road, Salt Lake City, Utah 84123.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan* (the *"Plan"*).

3. The Debtors have requested a variety of relief in the "first day" motions and applications (collectively, the "*First Day Motions*") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' businesses and proposed restructuring transactions. I am familiar with the contents of each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I further believe that the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations and aid in the implementation of the proposed restructuring transactions, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4. Part I of this Declaration describes the Debtors' corporate structure and business operations. Part II describes the Debtors' prepetition capital structure and indebtedness. Part III describes the circumstances leading to the commencement of these chapter 11 cases. And Part IV sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### I.    Corporate History and Structure

5. Headquartered in Salt Lake City, Utah and employing approximately 6,800 personnel throughout the United States, including Puerto Rico, and Canada, the Debtors are the leading provider of innovative telecommunication products and services for hard-of-hearing individuals.

6. Sorenson Laboratories, Inc. was formed in 1996 to develop low-cost video conferencing systems targeted at the consumer market. In March 2000, Sorenson Media, Inc. was formed as a direct subsidiary of Sorenson Laboratories, and it later introduced its innovative VP-100 videophone in 2002. In 2003, the state of Utah authorized Sorenson Media to provide video relay services ("*VRS*") to the hard-of-hearing. This certification allowed Sorenson to

2

begin receiving compensation from the government for providing VRS, and later, Internet Protocol Relay Service (*"IP Relay"*) and IP Captioned Telephone Service (*"IP CTS"*). In April 2005, Sorenson Media changed its name to Sorenson Communications, and Sorenson Laboratories was merged with and into Sorenson Communications.

7.      In 2005, certain investment funds affiliated with GTCR Golder Rauner, LLC (*"GTCR"*) acquired a controlling interest in Sorenson Communications Holdings, LLC, the Debtors' ultimate parent.  In December 2006, certain investment funds affiliated with Madison Dearborn Partners, LLC (*"Madison Dearborn"*) purchased an interest in the Debtors, and, since that time, each of GTCR and Madison Dearborn have jointly controlled the Debtors.

*[The remainder of this page is intentionally left blank]*

3

8.    A graphical depiction of the Debtors' current corporate structure is provided below.



## II.    Products and Services Overview

9.    The Debtors currently have two primary business lines:  VRS and IP CTS.  The Debtors first began offering VRS in 2003.  In early 2011, the Debtors launched CaptionCall, a "closed captioned" style IP CTS service.  With few exceptions, the Debtors provide their users

4

with the hardware (*e.g.*, videophones or CaptionCall phones) required to utilize the Debtors' VRS or IP CTS relay services at no cost to the user. The Debtors' professionals install such hardware and train the user in connection with such services. The Debtors primarily provide products and services to individuals residing in the United States.

10.    VRS enables hard-of-hearing and speech-impaired persons who use American Sign Language ("*ASL*") to communicate with voice telephone users through video equipment, providing significant opportunities for such individuals to communicate with friends, family, business customers and associates, and others. For example, for calls placed by a hard-of-hearing person, the VRS caller, using a videophone, television, computer, or a mobile device with a video camera device and a high speed Internet connection, contacts a VRS "Video Interpreter" (an "*Interpreter*"), who is a qualified sign language interpreter, located in one of the Debtors' 104 VRS interpreting centers. Video equipment links the user with the Interpreter so that the user and the Interpreter can see and communicate with each other in signed conversation. The Interpreter then places a telephone call to the party the user wishes to call. The Interpreter relays the conversation back and forth between the parties — in sign language with the user, and by voice with the hearing party. VRS can also be used by, for example, a hard-of-hearing person to receive voice telephone calls placed by a hearing party to the hard-of-hearing party's telephone number, with the call content translated to ASL by the Interpreter. The Interpreters can relay calls in English and in Spanish. In addition, as required by the Federal Communications Commission ("*FCC*"), a VRS subscriber can also use their Sorenson videophone to call other VRS subscribers directly to converse in ASL, without the intervention of an Interpreter (called "point-to-point" calls). The Debtors are not compensated for such point-

5

to-point calls on a per-minute basis from the Interstate Telecommunication Relay Service Fund (the "*TRS Fund*").

11. The Debtors are the largest VRS provider in the United States with a leading market share for all VRS telecommunications nationwide. In 2013, the Interpreters relayed over 90 million minutes of conversation for approximately 120,000 Sorenson VRS users. While the Debtors offer a wide array of mobile and tablet-based VRS services, a majority of the Debtors' 2013 monthly minutes were generated using its proprietary videophone. Unlike hearing users whose mobile usage has in many cases eclipsed landline usage, hard-of-hearing users still generally prefer the VRS videophone (landline equivalent) to mobile/portable devices due to its superior image, size, and quality, along with other features.

12. The following table contains descriptions of the Debtors' products and services:

| Product | Description |
| --- | --- |
| Sorenson VRS | Sorenson VRS is a free, 24-hour service that empowers hard-of-hearing users to place and receive calls through a professional ASL interpreter via a videophone and a high-speed internet connection. |
| Sorenson VP-200 Videophone | The Sorenson VP-200 is the Debtors' second-generation videophone featuring significantly improved video quality and a variety of deaf-friendly features. The VP-200 is seamlessly integrated with Sorenson VRS, making it possible for deaf, hard-of-hearing, and hearing individuals to easily communicate with each other using videophone technology. |
| Sorenson ntouch® | The Debtors' ntouch® line of products is the latest in integration of Sorenson VRS with modern day technology. The ntouch® VP videophone is the newest innovation in videophone technology designed specifically for the hard of hearing. The ntouch® VP is compatible with both Windows and Macintosh operating systems, and the Debtors offer applications for mobile devices and tablets. |
| Sorenson Video Center | The Debtors' Video Center is a first of its kind and gives videophone users a central location to access both information and entertainment in ASL. Video Center content includes missed-call messages recorded in ASL, technical training and educational videos for videophone equipment and VRS services, deaf-related news and educational information, and deaf-produced movies and footage of deaf events. Video Center content, |

6

| Product | Description |
|---------|-------------|
| | like all of the Debtors' services, is provided at no cost to the Debtors' users. The Debtors also offer access to the Video Center through various mobile applications. |
| CaptionCall | The CaptionCall service is accessed through the Debtors' proprietary CaptionCall phone that plugs into a phone line and high-speed internet connection. Dialing and answering calls with CaptionCall works like a regular telephone, but the phone uses the internet connection to provide audio from the non-subscriber's end of the conversation to one of the Debtors' relay centers, where the audio is transcribed and delivered to the CaptionCall phone and displayed on a touchscreen. The CaptionCall phone also has an amplified handset which helps users take advantage of their residual hearing. Functioning similar to "closed captioning" of a television program, CaptionCall converts the non-subscriber's speech to text so that the hard-of-hearing user can both listen to what the user on the other end of the call is saying, and then read a transcription shortly thereafter. CaptionCall is a desirable alternative to VRS for users that do not suffer complete hearing loss or are not able to communicate in ASL, such as persons who lose their hearing later in life. |

## III.    Regulatory Environment

13.    Title IV of the Americans with Disabilities Act (as amended, the "*ADA*"), which is codified as part of the Communications Act of 1934, as amended, governs the Debtors' businesses. The FCC promulgates rules and regulations under these acts. The ADA requires interstate telecommunications carriers, such as Sprint and Verizon, and interconnected and non-interconnected Voice over Internet Protocol providers, to contribute funds to the TRS Fund from which the Debtors receive more than 99% of their gross revenues — the Debtors' services are free to users, as, in most cases, is use of the necessary user equipment. The FCC also sets compensation rates and minimum performance standards. The Debtors' failure to comply with such rules and regulations could result in the FCC denying compensation for services rendered.

14.    Under the ADA, deaf, hard-of-hearing, and speech-impaired individuals are supposed to receive services that are "functionally equivalent" to voice telephone services. Under the ADA, the FCC must also ensure that users do not pay more for such services than the

7

rates paid for functionally equivalent voice communication services. Notably, the Debtors' failure to comply with the FCC's rules and regulations could result in compensation being denied for services rendered, as well as the imposition of fines or the revocation of the Debtors' authorization to provide TRS. Among other things, all IP-based TRS providers — including the Debtors with respect to both VRS and IP CTS — must be certified by the FCC to be eligible to be compensated for providing IP-based TRS, which certification is non-transferable. As a provider that was already lawfully providing IP-based TRS in July 2011 when the FCC made FCC certification mandatory for all IP-based TRS providers, the Debtors operate pursuant to interim eligibility while the FCC considers the Debtors' pending certification application.

## IV.   Employees

15.   As of January 1, 2014, the Debtors employed approximately 6,800 individuals, including approximately 6,220 hourly employees, 545 salaried employees, and 15 temporary or contract employees. Significantly, the vast majority of the Debtors' part-time employees are Interpreters or CaptionCall communications assistants. Sorenson Communications employs the majority of the Debtors' employees — 849 full-time employees and 4,281 part-time employees. The Debtors' employees and temporary or contract workers perform a variety of critical functions, including interpreting services, customer service, purchasing, installation services, and a variety of administrative, accounting, legal, finance, management, technology, supervisory, and other related tasks.

## PART II

### I.   Prepetition Capital Structure

#### A.   First Lien Credit Facility

16.   On March 15, 2013, Sorenson Communications, as borrower, and SCI Holdings and certain of its subsidiaries, as guarantors, entered into the First Lien Credit Agreement,

8

pursuant to which the lender parties thereto agreed to provide a senior secured first lien term loan facility in an aggregate principal amount of up to $550 million and a senior secured first-out first lien revolving credit facility in an aggregate principal amount of $25 million. The First Lien Credit Agreement contemplates a portion of such revolving credit facility not to exceed $7.5 million to be available for the issuance of certain letters of credit and another portion of such facility not to exceed $5 million to be available for certain swing line loans on same-day notice. The First Lien Credit Facility matures October 31, 2014. The First Lien Credit Agreement requires quarterly amortization payments of principal and interest. Interest is paid at Sorenson Communications' option as follows:

1. if a base rate loan, (subject to a floor of 2.25%) the greater of (a) the prime rate; (b) the federal funds effective rate plus 0.50%; and (c) the one month LIBOR rate plus 1%. The interest rate margin (subject to a floor of 1.25%) is equal to 3.00% for revolving loans and plus 7.25% for a term loan; or

2. if a Eurodollar rate loan, (subject to a floor of 1.25%) the one-month LIBOR rate. The interest rate margin is 4.00% for revolving loans and plus an applicable margin of 8.25% for a term loan.

17. The First Lien Credit Agreement allows voluntary prepayments in whole or in part, subject to certain prepayment requirements. The First Lien Credit Agreement contains provisions for prepayment from a ratable portion of the net proceeds received by Sorenson Communications from asset dispositions, insurance/condemnation proceedings, issuance of debt, change of control, and excess cash flow of Sorenson Communications. The First Lien Credit Agreement allows voluntary prepayments in whole or in part, subject to certain prepayment requirements.

18. The First Lien Credit Agreement contains certain covenants which, subject to exceptions, limit or restrict, among other things, Sorenson Communications' incurrence of liens, acquirement of debt, sales of assets, and indebtedness. Additionally, the First Lien Credit

9

Agreement contains covenants that, subject to exceptions, limit or restrict Sorenson Communications' activities and obligations. Sorenson Communications is required to maintain compliance with a consolidated leverage ratio covenant, specified in the First Lien Credit Agreement. With respect to the revolving credit facility only, and only when the outstanding revolving loan amount exceeds 15% of the amount committed for revolving loans, Sorenson Communications is required to maintain compliance with a consolidated leverage ratio covenant as of the last day of each fiscal quarter not to exceed 3.50:1.00.

19.     Sorenson Communications' obligations under the First Lien Credit Facility are unconditionally guaranteed, on a joint and several basis, by SCI Holdings, Allied Communications, and CaptionCall. Additionally, the obligations under the First Lien Credit Facility are secured by liens on substantially all of Sorenson Communications' and the guarantors' assets pursuant to the First Lien Security Agreement, by and between Sorenson Communications, SCI Holdings and certain of its subsidiaries, as grantors, and the First Lien Collateral Trustee. The revolving credit facility has "first out" priority vis-à-vis the first lien term loan facility and certain other permitted first lien indebtedness with respect to recoveries on, and distributions in respect of, the collateral under the First Lien Credit Facility Documents.

**B.     Secured Notes**

20.     Pursuant to that certain indenture, dated as of January 22, 2010, by and among Sorenson Communications, as issuer, SCI Holdings and certain of its subsidiaries, as guarantors, and U.S. Bank National Association, as trustee, Sorenson Communications issued $735 million aggregate principal amount of certain 10.5% second lien notes due February 1, 2015. Interest on the Secured Notes in the approximate amount of $38 million is payable semi-annually on February 1 and August 1 of each year.

10

21.    The Secured Notes are unconditionally guaranteed, on a joint and several basis, by SCI Holdings, Allied, and CaptionCall. Subject and subordinate to the liens granted to the First Lien Collateral Agent for the benefit of the holders of the first lien obligations to secure such obligations pursuant to the First Lien Security Agreement, the Secured Notes are secured by liens on substantially all of Sorenson Communications' and the guarantors' assets pursuant to that certain second lien pledge and security agreement, dated as of January 22, 2010, by and between Sorenson Communications, SCI Holdings and certain of its subsidiaries, as grantors, and U.S. Bank, as collateral agent.

22.    Outstanding principal balances as of the Petition Date are approximately $545.875 million and $735 million for the First Lien Credit Facility and Secured Notes, respectively. The Debtors have not drawn on the $25 million revolver.

## PART III

### Events Leading to the Chapter 11 Cases

**I.    FCC Regulatory Changes**

**A.    VRS Compensation Rate Changes**

23.    Since the Debtors began providing VRS in 2003, the compensation rates paid by the FCC have fluctuated substantially. Beginning in 2007, the FCC established a three-year price cap for VRS that provided substantial rate stability for the first time. In 2010, however, the FCC promulgated a substantial reduction in VRS rates and began a comprehensive review of its VRS regulations. The FCC concluded that review in June 2013, promulgating a schedule of rate reductions while simultaneously increasing minimum performance requirements in ways that are costly and may be infeasible to implement over the long term. These changes to compensation rates and performance metrics, as described below, have had a materially adverse impact on the Debtors' financial performance, prompting the Debtors to pursue chapter 11.

11

24.    The Debtors generate revenues almost exclusively from FCC compensation for VRS and IP CTS services and are therefore especially susceptible to FCC-imposed rate changes. Beginning in 2007, the FCC utilized a "three-tiered" rate plan for compensating VRS providers, although the differential between the tiers was not substantial until 2010. Under the tiered system, providers received the highest rates for the first 50,000 minutes of service provided per month, lower rates for minutes 50,001 to 1,000,000, and even lower rates for minutes over 1,000,000.

25.    Beginning on February 25, 2010, the FCC began a comprehensive review of the rates, structure, and practices of the VRS system. The stated goal was to review VRS rules to ensure the program's efficacy, efficiency, and sustainability. The FCC issued several interim orders and proposed a variety of additional rules addressing every aspect of the VRS program. On June 28, 2010, the FCC began seeking comment on changes to VRS compensation rates and changes to VRS delivery and market structure.

26.    In June 2013, the FCC completed its review and rulemaking, promulgating new rules that initiated a step-by-step transition from then-existing tiered compensation rates for VRS to new, substantially lower, tiered rates. The FCC also stated that it ultimately planned to replace its tiered rates with a unitary market-based compensation rate; however, the FCC did not adopt any rules or set a definitive timetable for taking the steps to establish a unitary, market-based rate. In the meantime, the FCC further reduced rates and set a schedule that will bring rates to a level that the Debtors believe may not be sustainable over the long term.

**B.    VRS Service Standard Changes**

27.    The FCC made a number of other changes to the VRS program that will increase the Debtors' operational costs. For example, the FCC changed speed-of-answer rules by (a) cutting the speed-of-answer requirement from 120 to 30 seconds and (b) increasing the

percentage of calls (to 85%) that must meet the speed-of-answer requirement. In addition, the FCC moved the measurement window for such speed-of-answer rules from monthly to daily which requires the Debtors to meet the speed-of-answer measurement for a significantly higher percentage of calls handled in order to qualify for compensation. These stricter speed-of-answer rules impair the Debtors' ability to use traditional cost reduction levers such as staff reduction and salary reduction to offset the decrease in revenues as a result of the FCC's contemporaneous cut in rates and will likely require the Debtors to hire additional Interpreters. And, the FCC has proposed to further reduce the speed-of-answer requirement from 30 to 10 seconds.

28. Another new rule will further increase the Debtors' costs of providing VRS. The rule requires VRS providers to submit information about users to a third-party administrator, including such users' Social Security Numbers, dates of birth, and eligibility certifications. VRS providers must also obtain users' consent before providing this information. To comply with this rule, providers will face significant administrative costs to collect and process information. To date, the FCC has not provided compensation for these costs while it is simultaneously reducing rates.

29. In light of the changes discussed above, along with other FCC reforms, the Debtors expect annual revenues to decrease 15% by January 1, 2015 from changes implemented under the June 2013 Order. The Debtors further expect annual revenues to decrease by an additional 15% by January 1, 2017. The Debtors project that compliance with the FCC's reforms will result in a reduction in the Debtors' operating cash flow to levels that cannot support their capital structure. In 2013, the Debtors' revenue was $526.4 million and they held $137.4 million in cash. By 2018, the Debtors expect revenue to drop to $419.6 million and cash to decrease to $84.9 million.

13

**C.      IP CTS Marketing Restrictions and "Default Off" Requirements**

30.      The Debtors began providing IP CTS services in January 2011.  The Debtors substantially increased the number of IP CTS subscribers by increasing awareness of captioned telephone services within the hard-of-hearing community.  In addition, the Debtors developed an industry-leading IP CTS handset, and paid a modest (usually approximately $50) fee to audiologists and other hearing health professionals, hard-of-hearing groups, and individual referring consumers for a lead that resulted in a successful IP CTS installation.

31.      In January 2013, without seeking public comment, the FCC issued emergency interim rules that, among other things, prohibited payments of referral fees, and mandated that, as of March 2013, all IP CTS phones be configured to default mode with captions off, such that a user had to affirmatively activate captions for each and every call.  In August 2013, the FCC adopted final rules that, among other things, maintained these two requirements, and which instituted a requirement that all consumers pay at least $75 for IP CTS equipment, unless that equipment was obtained through a federal, state, or local governmental program.  The Debtors appealed these rules and sought a stay pending appeal of the $75 equipment fee requirement and the "default off" requirement.  The United States Court of Appeals for the District of Columbia Circuit has since stayed the requirement that users pay $75 for IP CTS equipment, but not other portions of the FCC's August 2013 rules with respect to IP CTS.

32.      Since adoption of the FCC's January and August 2013 rules, the Debtors have added new IP CTS subscribers much more slowly than previously, and the average monthly usage by each customer has fallen by approximately half.  This has greatly reduced the margins the Debtors earn from IP CTS, as well as the rate of revenue growth.

DOCS_DE:191927.1 80459/001

## II.    Maturing Debt Obligations

33.    The Debtors face substantial debt maturity obligations.  As noted above, the First Lien Credit Facility matures on October 31, 2014 and the Secured Notes mature on February 1, 2015.  Thus, in less than a year, the Debtors are obligated to pay approximately $1.28 billion in funded debt obligations.  Simply put, due to the regulatory changes discussed above, the Debtors cannot pay or refinance such obligations based on their projected revenues and cash flow.

## III.    The Importance of Modifying the Debtors' Capital Structure

34.    As of January 31, 2014, the book value of the Debtors' assets totaled approximately $645 million and their liabilities totaled approximately $1.4 billion.  The Debtors' $550 million first lien credit facility and $735 million of senior secured notes are scheduled to mature in October 2014 and February 2015, respectively.  The impact of the changing regulatory environment of the VRS industry negatively affects the Debtors' ability to refinance their funded debt in the market, and the Debtors will not have sufficient cash to pay the principal balances on such debts as they become due.  Additionally, the Debtors require time to engage the FCC in discussions regarding setting compensation rates and performance standards at sustainable levels.  Accordingly, the Debtors must restructure their balance sheet now.

35.    The Debtors began restructuring negotiations with holders of over 77% in outstanding face value of the Secured Notes and their primary equity holders in September 2013, and on October 15, 2013, certain of such holders executed a non-disclosure agreement with the Debtors to facilitate negotiations.  These extensive negotiations among highly sophisticated parties resulted in the execution on February 27, 2014 of a support agreement by and among the Debtors and certain holders of Secured Notes Claims and Sorenson Interests in furtherance of a balance-sheet restructuring under the Plan.

DOCS_DE:191927.1 80459/001

36.     The Debtors, with the support of creditors holding a majority of Secured Notes, did not make an interest payment due in respect of the Secured Notes in February 2014 because restructuring negotiations were nearly complete.  This non-payment triggered a 30-day grace period under the Secured Notes Indenture.  Accordingly, in advance of termination of the grace period and to avoid any cross-default under the First Lien Credit Facility, the Debtors filed these chapter 11 cases.

37.     The Plan provides, among other things, that the Debtors will:  (a) enter into a new exit facility, consisting of a $550 million first lien term loan, which will be backstopped by certain holders of Secured Notes or their affiliates and, potentially, a $25 million first lien revolving credit facility; (b) repay in full the existing First Lien Credit Facility; (c) exchange existing Secured Notes for a combination of two series of new notes, new equity, and cash; and (d) exchange existing equity for a combination of new notes and new equity.  The current holders of Secured Notes will own 87% of the reorganized ultimate parent company.  Holders of First Lien Credit Facility claims are unimpaired under the Plan, as are general unsecured creditors — that is, such holders will be paid in full.

38.     The restructuring that the Plan implements will improve the Debtors' ability to service their debt and will extend the maturities of the Debtors' first and second lien debt until 2020.  Also, the new notes under the Plan contain paid-in-kind interest features that will provide the Debtors a longer liquidity runway.  This financial restructuring will afford the Debtors the breathing room they need to adjust their businesses to address the regulatory changes that have reshaped their industry and engage in discussions with the FCC regarding stabilizing the industry.

DOCS_DE:191927.1 80459/001

39.  A graphical depiction of the reorganized Debtors' corporate structure is provided below.



## PART IV[3]

40.     The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief. I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure consummation of the Debtors' proposed restructuring transactions. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

41.     I have reviewed each of the First Day Motions, including the exhibits thereto. The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the First Day Motions, and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.

## I.     All General Unsecured Creditors Motion[4]

42.     ***Relief Requested***. The Debtors seek entry of the Order authorizing them, in their sole discretion, to pay allowed prepetition Claims (collectively, the "*Claims*") of certain general unsecured creditors and creditors whose Claims may give rise to liens under certain state and federal laws (the "*Creditors*") in the ordinary course of business, including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships with Creditors, and for certain related relief.

---

[3]     Capitalized terms in this Part IV of the Declaration, to the extent not defined herein, have the meanings ascribed to them in the applicable First Day Motions.

[4]     *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order Authorizing the Debtors to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business* filed concurrently herewith.

18

43. Additionally, the Debtors seek that the Order require that (a) a Creditor that is subject to a prepetition contract with the Debtors maintain or apply, as applicable, contractual terms ("*Customary Terms*") during the pendency of these chapter 11 cases that are at least as favorable as those terms existing as of the Petition Date as a condition to receiving any payment under the Order and (b) if a Creditor, after receiving a payment under the Order, ceases to provide its Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Creditor or treat such payment as an avoidable postpetition transfer of property.

44. *The Claims.* The Creditors provide the Debtors goods and services in the ordinary course of business including, among other things, manufacturing services for the Debtors' VRS and CaptionCall equipment, shipping, warehousing, information technology services, financial services, leases of property and equipment, utility services, maintenance and repair services, legal services, human resources services, and other basic business necessities for the operation of the Debtors' businesses. Correspondingly, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Creditors in the ordinary course of business that aggregated to approximately $13.3 million per month on average for the calendar year 2013.

45. The following table contains descriptions of the Claims, as well as the Debtors' estimate of the amounts of the Claims accrued as of the Petition Date and, of those amounts, the amounts that are due in the ordinary course of business within 45 days of the Petition Date:

| Category | Description of Services Provided | Approximate Amount Accrued as of the Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Information Technology | IT hardware, software, and service providers | $1,515,000 | $1,210,000 |

| Category | Description of Services Provided | Approximate Amount Accrued as of the Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Manufacturing | Video relay and CaptionCall equipment production | $3,330,000 | $2,665,000 |
| Legal, Operations, Financial, and Human Resource Services | Legal firms and services, general operations and human resources services, labor relations and recruiting services, accounting, audit, tax, and other financial services | $1,815,000 | $1,455,000 |
| Real Property | Real estate leasing, facilities maintenance | $3,970,000 | $3,970,000 |
| Utilities | Electricity, gas, water and sewer, waste disposal, telecommunications | $605,000 | $605,000 |
| Other | Marketing, equipment maintenance, freight services, non-capitalized office supplies and equipment, and other miscellaneous services | $3,710,000 | $2,770,000 |
| **Total** | | **$14,945,000** | **$12,675,000** |

46.     The Debtors expect that substantially all of the Claims will be paid within 45 days of the Petition Date in the ordinary course of business.[5]

## II.     Cash Collateral Motion[6]

47.     *Relief Requested.* The Debtors seek entry of an Interim Order and a Final Order, which among other things, provide the Debtors with the following relief:  (a) authority to use the Prepetition Collateral, including the cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code; (b) approval of the form of adequate protection the Debtors will provide

---

[5]   The Debtors anticipate emerging from bankruptcy on or around 45 days after the Petition Date.

[6]   *See Motion of Sorenson Communications, Inc., et al. for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral and Granting Adequate Protection to Prepetition Secured Parties and (B) Scheduling a Final Hearing,* filed concurrently herewith.

DOCS_DE:191927.1 80459/001

under sections 361, 362, and 363 of the Bankruptcy Code; (c) scheduling a Final Hearing on the motion to consider entry of the Final Order; and (d) granting related relief.

48.    **The Debtors' Prepetition Capital Structure.**  As of January 31, 2014, the book value of the Debtors' assets totaled approximately $645 million and their liabilities totaled approximately $1.4 billion.  Refer to Part II of this Declaration for a detailed description of the Debtors' prepetition capital structure.

49.    **Facts Relevant to the Motion.**  Access to the Prepetition Collateral, including the Cash Collateral, is vital to preserving the going concern value of the Debtors.  The Debtors use the Cash Collateral in the ordinary course of business to procure goods and services from vendors, pay their employees, and satisfy other working capital needs.  Absent approval of the Interim Order, the Debtors will not be able to use the Cash Collateral to generate revenue, and thus operate their businesses, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.

50.    **Material Terms of the Interim Orders.**  The following summarizes the material terms of the Interim Orders, which are identical in all material respects and are discussed in more detail below, in accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(ii):[7]

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| Entities with an Interest in Cash Collateral<br><br>(Bankr. R. 4001(b)(1)(B)(i)) | JPMorgan Chase Bank, N.A., as First Lien Agent, swing line lender and issuing bank, Wilmington Trust National Association, as Collateral Trustee, and U.S. Bank National Association as Indenture Trustee. | b(i), b(ii) |
| Purpose for Use of Cash Collateral:<br><br>(Bankr. R. 4001(b)(1)(B)(ii); | The Debtors have an immediate and critical need to use Cash Collateral to permit, among other things, the orderly continuation of the operation of their businesses, to maintain | 8 |

---

[7]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the applicable Interim Order, with any inconsistencies resolved by reference to the applicable Interim Order.

21

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| Local R. 4001-2(a)(i)) | business relationships with vendors, suppliers and users, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization. The Debtors' use of Cash Collateral will be in accordance, in all material respects, with the terms of the Interim Order and the Approved Budget, subject to permitted variances. | |
| Findings of Validity, Perfection, or Amount of Prepetition Liens (Local R. 4001-2(a)(i)(B)) | The Debtors admit, acknowledge, stipulate and agree that: (a) First Lien Obligations. As of the Petition Date, the Debtors were unconditionally indebted and liable to the First Lien Secured Parties for all of the obligations pursuant to, and in accordance with the terms of, the First Lien Credit Agreement in an aggregate principal amount of approximately $545 million, plus prepetition interest thereon and fees, expenses, charges and other obligations incurred in connection therewith as provided in the First Lien Credit Facility Documents and certain hedging and cash management obligations owing to the First Lien Lenders and certain of their affiliates (collectively, the *"First Lien Prepetition Obligations"*), secured by first priority liens on and security interests (collectively, the *"First Priority Liens"*) in substantially all of the Debtors' assets including Cash Collateral, as more particularly described in and on the terms set forth in the First Lien Credit Facility Documents (the *"First Lien Prepetition Collateral"*), granted to, or for the benefit of, any and all of the First Lien Secured Parties. (b) As of the Petition Date, all claims in respect of the First Lien Prepetition Obligations (i) constitute legal, valid, binding and nonavoidable obligations of the Debtors and (ii) are not, and shall not be, subject to any avoidance, disallowance, disgorgement, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation. (c) The First Priority Liens: (i) constitute valid, binding, enforceable, nonavoidable, and properly perfected first priority liens on the First Lien Prepetition Collateral that, prior to the entry of the Interim Order, were senior in priority over any and all other liens on the First Lien Prepetition Collateral; subject only to those liens explicitly permitted by the First Lien Credit Facility Documents (to the extent any such | 6 |

22

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | permitted liens were valid, properly perfected, non-avoidable liens senior in priority to the First Priority Liens on the Petition Date, the "*First Lien Permitted Liens*"), if any; (ii) shall not be subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation; and (iii) are subject and subordinate only to (A) the Carve-Out (as defined below) and (B) the First Lien Permitted Liens, if any. | |

(d) The Debtors each irrevocably waive, subject to paragraph 23 of the Interim Order, for themselves and their direct and indirect subsidiaries any right to challenge or contest in any way the perfection, validity, or enforceability of the First Priority Liens or the allowance, validity or enforceability of the First Lien Prepetition Obligations and the First Lien Credit Facility Documents. The Debtors believe that the First Lien Prepetition Obligations constitute allowable, fully secured claims against the Debtors' estates.

(e) None of the First Lien Secured Parties are or shall be deemed to be control persons or insiders of the Debtors by virtue of any of the actions taken by such parties in respect of or in connection with the First Lien Prepetition Obligations or the First Lien Credit Facility Documents.

(f) Second Lien Obligations. As of the Petition Date, the Debtors were unconditionally indebted and liable to the Secured Note Parties in respect of obligations under the Secured Notes Indenture for (i) the aggregate principal amount of approximately $735 million on account of outstanding notes under the Secured Notes Indenture (plus accrued and unpaid interest thereon) and (ii) unpaid fees, expenses, charges and other obligations incurred in connection therewith as provided in the Secured Notes Documents (the "*Secured Notes Obligations*" and, together with the First Lien Prepetition Obligations, the "*Prepetition Obligations*"), secured by second-priority liens on and security interests (collectively, the "*Second Priority Liens*" and, collectively with the First Priority Liens, the "*Prepetition Liens*") in substantially all of the Debtors' assets including Cash Collateral, as more particularly described in and on the terms set forth in the Secured Notes Documents (the "*Second Lien Prepetition Collateral*" and, together with the First Lien Prepetition Collateral, the "*Prepetition Collateral*"), granted to, or for the benefit of, any or all of the Secured Note Parties pursuant to and in connection with the Secured Notes

23

|                     |                                      | **Para(s) of Interim** |
| :------------------ | :----------------------------------- | :--------------------- |
| **Material Terms**  | **Summary of Material Terms**        | **Order**              |

Documents.

(g) As of the Petition Date, all claims in respect of the Secured Notes Obligations (i) constitute legal, valid, binding and nonavoidable obligations of the Debtors and (ii) are not, and shall not be, subject to any avoidance, disallowance, disgorgement, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation.

(h) The Second Priority Liens: (i) constitute valid, binding, enforceable, nonavoidable, and properly perfected second priority liens on the Second Lien Prepetition Collateral that, prior to the entry of the Interim Order, were senior in priority over any and all other liens on the Second Lien Prepetition Collateral, subject only to the First Priority Liens and those liens explicitly permitted by the Secured Notes Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable liens senior in priority to the Second Priority Liens on the Petition Date, the "*Second Lien Permitted Liens*" and, together with the First Lien Permitted Liens, the "*Permitted Liens*"), if any; (ii) shall not be subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation; and (iii) are subject and subordinate only to (a) the First Priority Liens, (b) the Carve-Out (as defined below) and (c) the Second Lien Permitted Liens, if any.

(i) The Debtors each irrevocably waive, subject to paragraph 23 of the Interim Order, for themselves and their direct and indirect subsidiaries any right to challenge or contest in any way the perfection, validity, or enforceability of the Second Priority Liens or the allowance, validity or enforceability of the Secured Notes Obligations and the Secured Notes Documents. The Debtors believe that the Secured Notes Obligations constitute allowable, fully secured claims against the Debtors' estates.

(j) None of the Secured Note Parties are or shall be deemed to be control persons or insiders of the Debtors by virtue of any of the actions taken by such parties in respect of or in connection with the Secured Notes Obligations or the Secured Notes Documents.

DOCS_DE:191927.1 80459/001

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | (k) As of the Petition Date, the Debtors have not brought and, subject to paragraph 23 of the Interim Order, irrevocably waive their ability to bring, and are not aware of claims, objections, challenges, causes of action, including, without limitation, avoidance actions under chapter 5 of the Bankruptcy Code, against the Prepetition Secured Parties or the Released Parties (as defined below) arising out of or related to the Prepetition Obligations or the Prepetition Liens. | |
| | (l) As of the Petition Date, there were no other perfected liens or security interests in the Prepetition Collateral except for the Prepetition Liens and Permitted Liens. | |
| Challenge Period (Local R. 4001-2(a)(i)(B)) | The Adequate Protection Liens, the Superpriority Claims, and the Prepetition Liens shall be senior to, and no Collateral or Prepetition Collateral may be used to pay, any claims for services rendered by any of the professionals retained by the Debtors (or any successor trustee or other estate representative in the Chapter 11 cases or any successor case), any creditor or party in interest, any committee appointed in the Chapter 11 cases or any other party in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, investigation, objection, defense or other contested matter against any or all of the Prepetition Secured Parties in connection with (i) invalidating, setting aside, avoiding, subordinating, recharacterizing, or challenging, in whole or in part, any claims or liens arising under or with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, the Collateral, or the Prepetition Collateral, or (ii) preventing, hindering, or delaying, whether directly or indirectly, any or all of the Prepetition Secured Parties' assertions or enforcement of their liens, security interests, or realization upon any of the Collateral or the Prepetition Collateral. Notwithstanding anything herein to the contrary, any committee appointed in these Chapter 11 cases shall have sixty (60) days after its formation, and parties in interest shall have seventy-five (75) days after entry of the Interim Order (the "*Investigation Termination Date*"), to investigate the validity, perfection, enforceability, and extent of the Prepetition Obligations and Prepetition Liens and any potential claims of the Debtors or their estates against the Prepetition Secured Parties in respect of the Prepetition Obligations and Prepetition Liens, "lender liability" claims and causes of action, any actions, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims and causes of action (all such claims, defenses and other actions described in this paragraph are collectively defined as the "*Claims and Defenses*"); *provided, however,* | 23 |

25

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | that the Investigation Termination Date may be extended if agreed to in writing by the First Lien Agent, in its sole discretion, with respect to the First Lien Prepetition Obligations, or the Initial Holders, in their sole discretion, with respect to the Secured Notes Obligations. | |
| | Any challenge to the Prepetition Obligations or Prepetition Liens or the assertion of any other claims or causes of action of the Debtors or their estates against the Prepetition Secured Parties must be made by a party in interest with standing who timely and properly commences an adversary proceeding on or before the Investigation Termination Date. If no such action is properly filed on or before the Investigation Termination Date, all holders of claims and interests as well as other parties in interest shall be forever barred from bringing or taking any such action, and the Debtors' stipulations made herein and the release set forth in the Interim Order shall be binding on all parties in interest. If such an action is timely and properly brought, any claim or action that is not brought shall be forever barred. In the event of a timely and successful challenge by a plaintiff in such an action, this Court shall fashion the appropriate remedy with respect to the Prepetition Secured Parties after hearing from all parties. | |
| Carve-Out<br><br>(Local R. 4001(a)(i)(F)) | As used in the Interim Order, "*Carve-Out*" shall mean, upon the Termination Date, the sum of: (a) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to section 1930(a) of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code, (b) fees and expenses of up to $50,000 incurred by a trustee if one is appointed pursuant to Bankruptcy Code section 726(b) and (c), in accordance with the Approved Budget, any and all accrued and unpaid fees, disbursements, costs and expenses (the "*Professional Fees*") incurred by professionals or professional firms retained by the Debtors or their estates pursuant to section 327, 328, or 363 of the Bankruptcy Code and any statutory committee appointed in the Debtors' Chapter 11 cases pursuant to section 1103 of the Bankruptcy Code (collectively, the "*Professionals*"), which Professional Fees are (x) allowed by the Bankruptcy Court at any time and (y) were incurred at any time on or before the first Business Day following delivery by the First Lien Agent and the Initial Holders to counsel to the Debtors identified in paragraph 41, the U.S. Trustee, and counsel to any committee appointed in the Chapter 11 cases written notice (the "*Carve-Out Trigger Notice*"), which notice may be delivered at any time following the occurrence and during the continuation of | 22 |

DOCS_DE:191927.1 80459/001

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | any Termination Event, stating that the Carve-Out Cap (as defined below) has been invoked; and (d) the Professional Fees allowed by the Bankruptcy Court in an aggregate amount not exceeding $1,000,000 (the "*Carve-Out Cap*"), which Professional Fees are incurred by the Professionals after the First Business Day following delivery by the First Lien Agent of the Carve-Out Trigger Notice in accordance with the immediately preceding clause (c); *provided, however,* that: (x) the Carve-Out shall not be available to pay any Professional Fees incurred by any party, including the Debtors or any Committee or any Professionals engaged thereby, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Parties, it being understood that up to an aggregate of $25,000 shall be made available to any committee appointed in the Chapter 11 cases for investigation costs, as described in paragraph 23 of the Interim Order; including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Prepetition Loan Documents in favor of the Prepetition Secured Parties including, without limitation, for lender liability or pursuant to Bankruptcy Code sections 105, 510, 544, 547, 548, 549, 550 or 552, applicable nonbankruptcy law or otherwise; (ii) attempts to modify any of the rights granted to the Prepetition Secured Parties under the Interim Order; (iii) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties' assertion, enforcement or realization upon any Collateral in accordance with the Prepetition Loan Documents, the Intercreditor Agreement and the Interim Order; or (iv) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court. Any claim incurred in connection with any of the activities described above (other than as permitted pursuant to paragraph 23 of the Interim Order) shall not be allowed, treated or payable as an administrative expense claim for purposes of Bankruptcy Code section 1129(a)(9)(A). The Carve-Out shall not be reduced by the payment of Professional Fees incurred prior to delivery of the Carve-Out Trigger Notice and allowed at any time by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code; *provided, however,* that after delivery of a Carve-Out Trigger Notice in accordance with clause (c) above, the amount in the Carve-Out Account (as defined below) shall be reduced on a dollar-for-dollar basis for Professional Fees incurred after the delivery of the Carve- | |

27

DOCS_DE:191927.1 80459/001

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | Out Trigger Notice and allowed by this Court that are paid to the Professionals from the Carve-Out Account and the Carve-Out Account shall not be replenished for any such amounts so paid, and without prejudice to the rights of the Professionals or the Debtors to contest any such objection, nothing in the Interim Order shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such Professionals. Upon receipt by the Debtors of a Carve-Out Trigger Notice and, in any event, prior to making any distribution of Collateral, Prepetition Collateral or the proceeds thereof to the Prepetition Secured Parties or otherwise, the Debtors shall promptly deposit an amount equal to the Professional Fees incurred and unpaid as of such date plus an amount equal to the Carve-Out Cap in a segregated account (the *"Carve-Out Account"*) to be utilized solely for the payment of Professional Fees; provided, however, that the Debtors' depositing such monies into the Carve-Out Account shall not impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. The Debtors' deposit of any such Carve-Out Account shall not reduce the amount of the Carve-Out or limit the Professionals eligible to be paid therefrom. As described in the Interim Order, the Carve-Out shall be senior to all liens and claims securing the Prepetition Obligations, the Adequate Protection Liens and the Superpriority Claims, and any and all other forms of adequate protection, liens, security interests and administrative, superpriority or other claims granted pursuant to the Interim Order. | |
| Adequate Protection | Adequate Protection of Interests | 17-19 |
| (Bankr. R. 4001(b)(1)(B)(iv); Local R. 4001-2(a)(i)(B)) | Each Prepetition Secured Party is entitled, pursuant to Bankruptcy Code sections 361 and 363(c) and (e), to adequate protection of its interests in the Prepetition Collateral for and equal in amount to the aggregate diminution in value (the *"Diminution in Value"*) of such Prepetition Secured Party's interests in the Prepetition Collateral (the *"Adequate Protection Obligations"*) during the period from and including the Petition Date through and including the date of termination of the use of Cash Collateral (the *"Interim Period"*), calculated in accordance with Bankruptcy Code section 506(a), including, without limitation, any Diminution in Value resulting from the depreciation, physical deterioration, sale, lease, use or decline in market value of the Prepetition Collateral (including, without limitation, Cash Collateral) and the imposition of the automatic stay under Bankruptcy Code section 362. For the avoidance of doubt, | |

28

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | the use of Cash Collateral for any purpose shall constitute a Diminution in Value of the Prepetition Collateral and shall entitle the Prepetition Secured Parties to dollar-for-dollar Adequate Protection Liens (as defined below) in accordance with the terms of the Interim Order. | |

First Lien Adequate Protection

Adequate Protection Liens: As security for and solely to the extent of any Diminution in Value of the First Lien Secured Parties' interests in the Prepetition Collateral during the Interim Period, the Collateral Trustee is hereby granted for its benefit and the benefit of the First Lien Lenders, effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, valid, enforceable, nonavoidable and fully and automatically perfected first-priority postpetition security interests in and liens (the "*First Lien Adequate Protection Liens*") on all Collateral of the Debtors other than the Excluded Assets (as defined below), subject and subordinate only to (i) any First Lien Permitted Liens and (ii) the Carve-Out, in accordance with the terms and conditions set forth in the Interim Order.

Superpriority Claim: To the extent of any Diminution in Value of the First Lien Secured Parties' interests in the Prepetition Collateral during the Interim Period, the First Lien Agent, on behalf of itself and the First Lien Lenders, is hereby granted a first-priority administrative expense claim (the "*First Lien Superpriority Claim*") as provided for in Bankruptcy Code section 507(b). The First Lien Superpriority Claim shall, subject and subordinate only to the Carve-Out, be an allowed claim against each Debtor jointly and severally with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, which allowed First Lien Superpriority Claim shall be payable from and have recourse to all Collateral of the Debtors. Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection

29

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
|  | provided to the First Lien Agent, the Collateral Trustee or the other First Lien Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 cases. |  |
|  | Postpetition Interest: Immediately upon entry of the Interim Order, the Debtors shall pay to the First Lien Agent (on behalf of the First Lien Secured Parties), on an ongoing basis, the current cash payment of interest at the applicable rates set forth in, and at the times provided for in, the First Lien Credit Agreement (the "*Interest Payments*") (whether or not such Interest Payments are included in the Approved Budget). |  |
|  | Fees and Expenses: Immediately upon entry of the Interim Order, the Debtors are authorized and directed to pay all accrued and unpaid prepetition and postpetition fees and expenses of the First Lien Secured Parties pursuant to the First Lien Credit Facility Documents, including reasonable and documented unpaid fees and expenses of the First Lien Professionals (as defined below). In addition, during the Interim Period, the Debtors shall, in accordance with the First Lien Credit Agreement and the Collateral Trust Agreement, promptly pay or reimburse the reasonable and documented prepetition and postpetition fees, costs and out-of-pocket expenses of (i) Latham & Watkins LLP, counsel to the First Lien Agent, (ii) Richards, Layton & Finger, P.A., local counsel to the First Lien Agent, (iii) a financial advisor to the First Lien Agent, in the event the First Lien Agent determines that, based on the circumstances, it is necessary and in its best interests to retain a financial advisor as provided for under the First Lien Credit Agreement, (iv) counsel to the Collateral Trustee and (v) local counsel to the Collateral Trustee (collectively, the "*First Lien Professionals*"), in each case, in accordance with the engagement letters of such professionals and without further order of, or application to, this Court or notice to any party; *provided that* if the payment of such aggregate reasonable and documented fees and expenses of the First Lien Professionals causes the Debtors' expenditures to exceed amounts permitted by the Approved Budget, such excess payments shall not constitute a Termination Event. After delivery of a statement of fees and expenses (redacted for privilege), the Debtors are authorized and directed to pay such fees, costs and expenses, within ten (10) business days of delivery of an invoice to the Debtors, in accordance with the terms of the Interim Order, without the First Lien Agent or the Collateral Trustee having to file any further application with this Court for approval or payment of such fees, costs and expenses. All amounts paid as adequate protection are |  |

30

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | deemed permitted uses of Cash Collateral. | |

Recharacterization: Notwithstanding anything to the contrary set forth herein, if the Court finally determines that any or all of the First Lien Secured Parties are not entitled to receive all or any portion of the interest, fees and expenses paid pursuant to paragraphs 18(c) and (d) of the Interim Order, then such amounts paid to or for the benefit of the applicable First Lien Secured Parties will instead be deemed recharacterized as repayments of principal in reduction of the applicable First Lien Prepetition Obligations or subject to disgorgement, in each case as ordered by the Court as part of such final determination.

Information: During the Interim Period, the Debtors shall continue to provide the First Lien Agent with financial and other reporting in accordance with the First Lien Credit Agreement. Any information provided pursuant to paragraph 18 of the Interim Order shall be subject to the confidentiality provisions of the First Lien Credit Agreement, which provisions shall remain in full force and effect.

Second Lien Adequate Protection

Adequate Protection Liens: As security for and solely to the extent of any Diminution in Value of the Secured Note Parties' interests in the Prepetition Collateral, in accordance with, and subject to the terms of, the Intercreditor Agreement, the Indenture Trustee is hereby granted for its benefit and the benefit of the Note Holders, effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, valid, enforceable, nonavoidance and fully and automatically perfected second-priority postpetition security interests in and liens on all the Collateral of the Debtors other than the Excluded Assets (the "*Second Lien Adequate Protection Liens*" and, together with the First Lien Adequate Protection Liens, the "*Adequate Protection Liens*"), subject and subordinate only to (i) the First Priority Liens, (ii) the First Lien Adequate Protection Liens, (iii) any Permitted Liens and (iv) the Carve-Out.

Superpriority Claim: To the extent of any Diminution in Value of the Secured Note Parties' interests in the Prepetition Collateral during the Interim Period, the Indenture Trustee, on behalf of itself and the Note Holders, is hereby granted a second-priority administrative expense claim (the "*Second Lien Superpriority Claim*" and, together with the First Lien Superpriority Claim, the "*Superpriority Claims*") as provided

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | for in Bankruptcy Code section 507(b). The Second Lien Superpriority Claim shall, subject and subordinate only to (a) the First Priority Liens, (b) the First Lien Superpriority Claim and (c) the Carve-Out, be an allowed claim against each Debtor (jointly and severally) with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, which allowed Second Lien Superpriority Claim shall be payable from and have recourse to all Collateral of the Debtors other than the Excluded Assets. Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Indenture Trustee or the Note Holders hereunder is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 cases. | |
| | Fees and Expenses: Immediately upon entry of the Interim Order, the Debtors are authorized and directed to pay all accrued and unpaid fees and expenses of the Secured Note Parties, including reasonable and documented unpaid fees and expenses of the Second Lien Professionals (as defined below). In addition, during the Interim Period, the Debtors shall, in accordance with the Secured Notes Indenture, promptly pay or reimburse the reasonable and documented fees, costs and out-of-pocket expenses incurred by the Secured Note Parties including, without limitation, the fees, costs and expenses of (i) Dorsey & Whitney LLP, counsel to the Indenture Trustee, (ii) Akin Gump Strauss Hauer & Feld LLP, counsel to the Initial Holders, (iii) Houlihan Lokey, Inc., financial advisor to the Initial Holders, (iv) Blank Rome LLP, local counsel to the Initial Holders, and any consultants or other advisors retained by the Initial Holders in connection with the Chapter 11 cases (collectively, the "*Second Lien Professionals*"), in each case, in accordance with the engagement letters of such professionals and without further order of, or application to, this Court or notice to any party; *provided that*, if the payment of such aggregate reasonable and documented fees and expenses of the Second Lien Professionals causes the Debtors' expenditures to exceed amounts permitted by the | |

32

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | Approved Budget, such excess payments shall not constitute a Termination Event. After delivery of a statement of fees and expenses (redacted for privilege) in accordance with each party's applicable engagement letter, the Debtors are authorized and directed to pay all fees, costs and expenses, within ten (10) business days of delivery of an invoice to the Debtors, in accordance with the terms of the Interim Order, without the Indenture Trustee or the Initial Holders having to file any further application with this Court for approval or payment of such fees, costs and expenses. All amounts paid as adequate protection are deemed permitted uses of Cash Collateral.<br><br>Recharacterization: Notwithstanding anything to the contrary set forth herein, if the Court finally determines that any or all of the Secured Note Parties are not entitled to receive all or any portion of the fees and expenses paid pursuant to paragraph 19(c) of the Interim Order, then such amounts paid to or for the benefit of the applicable Secured Note Parties will instead be deemed recharacterized as repayments of principal in reduction of the applicable Secured Notes Obligations or subject to disgorgement, in each case as ordered by the Court as part of such final determination. | |
| Duration of Use of Cash Collateral<br><br>(Bankr. R. 4001(b)(1)(B)(iii); Local R. 4001-2(a)(ii)) | Notwithstanding anything in the Interim Order to the contrary, and unless the First Lien Agent and the Initial Holders otherwise consent in writing in their sole discretion, the use of Cash Collateral authorized herein shall terminate without prior notice or order of the Court or any further action by any Prepetition Secured Party, upon the occurrence of the *"Termination Date."* The Termination Date shall occur (notice of which shall be provided thereafter to the Debtors, the U.S. Trustee, and any committee appointed in the Chapter 11 cases) on the earliest to occur of (each of the following, a *"Termination Event"*): (i) the date that is 75 days from the Petition Date; (ii) upon the expiration of the Approved Budget and upon written notice by the First Lien Agent, unless a supplemental Approved Budget has been agreed upon by the Initial Holders and the First Lien Agent; (iii) the date that is 40 days days after the Petition Date if a Final Order (provided that such Final Order has not been reversed, vacated, stayed, unless such stay has been vacated, or appealed, unless such appeal has been dismissed or otherwise finally resolved) authorizing the use of Cash Collateral, in accordance with the terms of the Interim Order and otherwise acceptable to the Initial Holders and the First Lien Agent, has not been entered; (iv) five (5) business days after the date (A) the Initial Holders or (B) the First Lien Agent provides the Debtors with written | 14, 15 |

33

DOCS_DE:191927.1 80459/001

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | notice of the Debtors' failure to comply with any of the terms or conditions of the Interim Order, including, without limitation, the payment by the Debtors of any expenses other than in accordance with the Approved Budget (subject to Permitted Variances); (v) the date an application, motion or other pleading is filed by the Debtors seeking to amend, modify, supplement or extend the Interim Order without the prior written consent of the Initial Holders and the First Lien Agent; or the date of entry of any order reversing, amending, supplementing, staying, vacating or otherwise modifying the Interim Order without the prior written consent of the Initial Holders and the First Lien Agent; (vi) the date any provision of the Interim Order shall for any reason cease to be valid and binding or the Debtors shall so assert in any pleading filed in any court; (vii) the date an application is filed by the Debtors for the approval of any superpriority claim or any lien in the Chapter 11 cases which is *pari passu* with or senior to any or all of the Adequate Protection Liens, Superpriority Claims, or Prepetition Liens without the prior written consent of the Initial Holders and the First Lien Agent; (viii) the effective date of any confirmed chapter 11 plan in the Chapter 11 Cases; (ix) unless otherwise agreed in writing by the Initial Holders and the First Lien Agent, the date of the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors; (x) unless otherwise agreed in writing by the Initial Holders, five (5) business days after a notice of the termination of the Support Agreement has been delivered by any party thereto; (xi) the date an order is entered by the Bankruptcy Court granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any asset of the Debtors with a value in excess of $100,000; (xii) the date the plan of reorganization filed pursuant to the Support Agreement on the first day of the Chapter 11 cases is amended or modified, or if any Debtor files a pleading seeking to amend or modify such plan in any manner that (A) alters the treatment of the claims of any First Lien Secured Party in such a way as to render such claim impaired (as defined in the Bankruptcy Code) or (B) adversely affects the releases and exculpatory protections set forth in such plan of reorganization in favor of any First Lien Secured Party; (xiii) the date (A) the Chapter 11 cases shall be dismissed or converted to cases under chapter 7 of the Bankruptcy Code or the Debtors shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 cases pursuant to Bankruptcy Code section 1112 or otherwise, or (B) a trustee | |

34

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| | or an examiner with expanded powers is appointed or elected in any or all of the Chapter 11 cases or the Debtors apply for, consent to, or acquiesce in, any such appointment without the prior written consent of the Initial Holders and the First Lien Agent; (xiv) the date the Debtors commence of any action against any or all of the Prepetition Secured Parties with respect to any or all of the Prepetition Obligations or the Prepetition Liens without the prior written consent of the Initial Holders and the First Lien Agent; (xv) the withdrawal, amendment, modification of, or filing of a pleading by the Debtors seeking to withdraw, amend or modify the plan of reorganization filed pursuant to the Support Agreement on the first day of the Chapter 11 cases, in a manner not acceptable to the Initial Holders; (xvi) the date an order is entered by the Court invalidating, disallowing, avoiding, recharacterizing, subordinating, offsetting or limiting in any respect, as applicable, either (A) the legality, enforceability, priority, validity and binding nature of any or all of the Prepetition Liens or Adequate Protection Liens securing the Prepetition Obligations or (B) any of the Prepetition Obligations or the Superpriority Claims, in each case without the prior written consent of the Initial Holders and the First Lien Agent; or (xvii) the date any material contract of the Debtors is rejected under section 365 of the Bankruptcy Code or any material property of the Debtors is sold, in each instance, without the express written consent of the Initial Holders and the First Lien Agent. | |
| | The Debtors' authority to use Cash Collateral shall automatically terminate upon the occurrence of the Termination Date, unless waived in writing by the Initial Holders and the First Lien Agent, where applicable, all without further order or relief from the Court. Upon the occurrence of the Termination Date, all Adequate Protection Obligations shall become due and payable, subject to prior provision for the Carve-Out, and the Prepetition Secured Parties shall have all rights and remedies provided in the Interim Order and under applicable law, in each case, subject to the terms of the Intercreditor Agreement. Notwithstanding anything herein or the occurrence of the Termination Date, all of the rights, remedies, benefits, and protections provided to the Prepetition Secured Parties under the Interim Order shall survive the Termination Date. | |
| Provisions Seeking to Affect the Court's Power Under 11 U.S.C. § 552(b)(1) | In light of the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out, to permit the use of the Prepetition Collateral and to permit the use of their Cash Collateral for payments made in accordance with | 9, 26 |

| Material Terms | Summary of Material Terms | Para(s) of Interim Order |
|---|---|---|
| (Local R. 4001-2(a)(i)(H)) | the Approved Budget, subject to Permitted Variances and the terms of the Interim Order, subject to the Final Hearing and entry of the Final Order, each of the Prepetition Secured Parties is entitled to (a) a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b) and (b) a waiver of the provisions of Bankruptcy Code section 506(c). Upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of the Prepetition Collateral, including the Cash Collateral.<br><br>In light of the subordination of their liens to the Carve-Out, subject to the Final Hearing and entry of the Final Order, the Prepetition Secured Parties shall be entitled to all benefits of Bankruptcy Code section 552(b) and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, product, offspring or profits of any of their Collateral. | |
| Provisions Seeking to Waive the Estate's Rights Without Notice 11 U.S.C. § 506(c)<br><br>(Local R. 4001-2(a)(i)(C)) | In light of the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out, to permit the use of the Prepetition Collateral and to permit the use of their Cash Collateral for payments made in accordance with the Approved Budget, subject to Permitted Variances and the terms of the Interim Order, subject to the Final Hearing and entry of the Final Order, each of the Prepetition Secured Parties is entitled to (a) a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b) and (b) a waiver of the provisions of Bankruptcy Code section 506(c). Additionally, upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the Collateral, the First Lien Agent, the Indenture Trustee, or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the First Lien Agent and the Initial Holders and no such consent shall be implied from any other action, inaction, or acquiescence by the First Lien Agent or the Prepetition Secured Parties. | 9 |

36

## III.    Cash Management Motion[8]

51.    ***Relief Requested.***  The Debtors seek entry of the Order authorizing them, in their sole discretion, to: (a) continue to operate the existing Cash Management System; (b) honor certain prepetition obligations related thereto; (c) continue to invest funds in accordance with the Debtors' current investment practices; and (d) maintain existing business forms.

52.    ***The Cash Management System.***  The Cash Management System is similar to the centralized cash management systems used by other large, diversified companies to manage the cash of multiple operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, controls, and reporting.

53.    ***Cash Collections and Disbursements.***  The Cash Management System consists of the eight bank accounts (collectively, the "***Bank Accounts***")[9] residing at JPMorgan Chase.  The Debtors' maintain an operating account for each of their operating entities — Sorenson Communications, CaptionCall, and Sorenson Communications of Canada, ULC ("***SCI Canada***"), payroll accounts and merchant credit card accounts for Sorenson Communications and CaptionCall, and a savings account at Sorenson Communications.  The Debtors' finance department manages the Bank Accounts, including the opening, closing, and day-to-day maintenance of the Debtors' accounts.

---

[8]    *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Current Investment Practices, and (D) Maintain Existing Business Forms,* filed concurrently herewith.

[9]    In the ordinary course of business, the Debtors may close existing accounts or open new accounts.

DOCS_DE:191927.1 80459/001

54. The Debtors engage in certain intercompany transactions between Sorenson Communications and SCI Canada, and between Sorenson Communications and CaptionCall. *First*, with the exception of certain one-time licensing fees paid by end users to CaptionCall via credit card, Sorenson Communications collects all receipts for both SCI Canada and Caption Call. Sorenson Communications periodically disburses these funds to SCI Canada and CaptionCall on account of sales generated by such entities as needed for their operations. *Second*, Sorenson Communications allocates shared overhead charges to SCI Canada and CaptionCall. *Third*, Sorenson Communications also has a payable recorded from CaptionCall on account of its equity investment therein. The Debtors' finance department manages the intercompany transactions and all Bank Accounts, including the opening, closing, and day-to-day maintenance of the Debtors' accounts.

55. Cash flows into the Cash Management System by way of written checks, wire transfers, and credit card payments to the Debtors' general operating accounts and active merchant credit card account. Funds are disbursed from the system by way of checks, automatic clearing house ("*ACH*") transfers, and wire transfers. The finance department prepares and executes outgoing payments, subject to internal approvals. It uses an automated system for recording and reconciling all cash collections and disbursements.

56. The finance department maintains supporting documentation for all cash and debt transactions. It performs month-end reconciliations of the Bank Account information to the Debtors' general ledger. In addition, it implements cash management controls on behalf of the enterprise. These controls are tested annually in connection with their year-end audit.

57.   ***The Bank Accounts.*** The Bank Accounts are described in the following table:

| Category | Description |
| --- | --- |
| Operating (Sorenson Commmunications) | The Sorenson Communications operating account is the Debtors' main operating account. The FCC deposits compensation from the TRS Fund — the Debtors' primary revenue source — into this account on a monthly basis. Funds in the account are transferred to the Sorenson Communications payroll account, the CaptionCall operating account, and the SCI Canada operating account for use to defray various expenses of the business. The Debtors pay Sorenson Communications vendors and make other miscellaneous disbursements from the Sorenson Communications operating account on an as needed basis. The Debtors transfer excess cash from the Sorenson Communications operating account into the Sorenson Communications savings account each month. |
| Operating (CaptionCall) | The Debtors maintain a CaptionCall operating account. The CaptionCall operating account receives funds periodically via interbank transfer from the Sorenson Communications operating account, from the CaptionCall merchant credit card account, and from miscellaneous checks and wire transfers. The Debtors process user credit card payments through the CaptionCall merchant credit card account and then transfer such funds into the CaptionCall operating account periodically, but generally no less than once a month. The Debtors transfer funds from the CaptionCall operating account to the CaptionCall payroll account on a semi-monthly basis. The Debtors pay CaptionCall vendors, issue refund checks to customers, and make other miscellaneous disbursements from the CaptionCall operating account on an as-needed basis. |
| Operating (SCI Canada) | The Debtors maintain an SCI Canada operating account denominated in Canadian Dollars. The SCI Canada operating account receives Canadian-denominated funds from the Sorenson Communications operating account and also receives other miscellaneous receipts directly. When funds are transferred from the Sorenson Communications operating account to the SCI Canada operating account, Sorenson Communications purchases Canadian Dollars and wires them to the SCI Canada account. All SCI Canada's receipts and disbursements flow directly into and out of the SCI Canada operating account. The Debtors process all SCI Canada receipts and disbursements, including SCI Canada's payroll and vendor disbursements, directly from the SCI Canada operating account. |
| Payroll (Sorenson Communications) | The Debtors maintain a Sorenson Communications payroll account from which they pay Sorenson Communications employees. The Debtors fund the Sorenson Communications payroll account in advance on a semi-monthly basis by transferring funds from the Sorenson Communications operating account. Similarly, the Debtors make payroll disbursements to Sorenson Communications employees from the Sorenson Communications payroll account on a semi-monthly basis via checks or ACH transfers. |
| Payroll (CaptionCall) | The Debtors maintain a CaptionCall payroll account from which they pay CaptionCall employees. The Debtors fund the CaptionCall payroll account |

| | |
|---|---|
| | in advance on a semi-monthly basis by transferring funds from the CaptionCall operating account.  Similarly, the Debtors make payroll disbursements to CaptionCall employees on a semi-monthly basis via checks or ACH transfers. |
| Merchant Credit Card (CaptionCall) | The Debtors maintain a CaptionCall merchant credit card account to process one-time telephone licensing fees paid to the Debtors by end users. The Debtors transfer funds from the CaptionCall merchant credit card account to the CaptionCall operating account periodically.  The Debtors also pay certain bank and processing fees and issue customer credit card refunds from the Caption Call merchant credit card account. |
| Merchant Credit Card (Sorenson Communications) | The Debtors also maintain a Sorenson Communications merchant credit card account formerly used for VRS-related services.  This account is now dormant. |
| Savings (Sorenson Communications) | The Debtors invest their excess cash in the Sorenson Communications savings account.  The Debtors transfer cash to and from the Sorenson Communications savings account periodically based on the Debtors' cash flow projections.  The Sorenson Communications savings account is the Debtors' sole excess cash investment vehicle. |

58.     The Debtors pay JPMorgan Chase approximately $6,000 per month, on the 15th of each month, on account of fees incurred in connection with the Bank Accounts.  Therefore, the Debtors estimate that they owe JPMorgan Chase approximately $6,000 as of the Petition Date, the entirety of which will become due and payable within 21 days of the Petition Date.

## IV.    Community Programs Motion[10]

59.     *Relief Requested.*  The Debtors seek entry of the Order authorizing the Debtors to honor certain prepetition obligations related to their users and certain community programs individuals with hearing loss (collectively, the *"Community Programs"*) and to continue all Community Programs in the ordinary course of business.

60.     *Community Programs.*  In connection with their business operations, the Debtors utilize the Community Programs to attract and retain users, as well as market new or upgraded services to their users.  Community Programs are used to ensure user satisfaction and ultimately

---

[10]    *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order Authorizing the Debtors to Honor Prepetition Obligations Associated with, and to Continue, Community Programs in the Ordinary Course of Business,* filed concurrently herewith.

40

enhance the Debtors' cash flow. In certain instances, users would not use the Debtors' services if the Debtors did not perform under their Community Programs, particularly because the Debtors' competitors offer their own community programs. In addition, the Debtors use certain of the Community Programs to collect FCC-required information from their users.

61.    The following table contains descriptions of the Community Programs and the Debtors' estimate of the amounts of their obligations to third parties in connection with the Community Programs accrued as of the Petition Date, and, of those amounts, the amounts that are due in the ordinary course of business within 45 days of the Petition Date:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
| --- | --- | --- | --- |
| User Support and Community Outreach | The Debtors participate in a variety of trade shows and community events. These include both large events, such as AARP conventions and DeafNation Expo, as well as smaller, local events, such as town hall meetings. These forums improve user awareness of the Debtors' services' newest features and provide a setting for users to obtain support for existing services and register for new or upgraded services. | $413,220 | $413,220 |
| | Also, the FCC requires that the Debtors collect certain information about their users and that the Debtors' users follow specific registration and certification procedures before they can access the Debtors' services. The Debtors collect this information and assist their users in completing these required registration and certification steps through mail, fax, email, and online registration services as well as providing personal assistance at the above-mentioned trade shows and community events. | | |
| Community Sponsorships | To engender goodwill and spread awareness of the Debtors' services, the Debtors either sponsor or make donations to support community, charity, and educational ventures and events targeting individuals with hearing loss, such as fundraising events at deaf schools, local deaf clubs, and | $5,000 | $5,000 |

41

DOCS_DE:191927.1 80459/001

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | advocacy groups. | | |
| User Refunds | As part of their CaptionCall service, the Debtors provide CaptionCall phones to their users. As required by the FCC, the Debtors charge users a one-time fee of $75 for the phone if the users have not been certified with a hearing health care professional. In certain instances, these users later receive certification and request a refund of the $75 fee, which the Debtors generally grant. In some cases, users may also decide that they no longer want the service and request a refund of the one-time fee, which the Debtors also generally grant. | $500 | $500 |
| **Total** | | **$418,720** | **$418,720** |

62.     The Debtors estimate that all of these prepetition obligations constitute actual cash obligations which are due within 45 days of the Petition Date.

## V.     KCC Retention Application Pursuant to Section 156(c)[11]

63.     ***Relief Requested.***  The Debtors seek entry of an Order approving the Services Agreement between the Debtors and Kurtzman Carson Consultants LLC ("***KCC***") and the Debtors' retention and employment of KCC as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware and for related relief, effective *nunc pro tunc* to the Petition Date.

64.     ***Services to be Provided.***  The retention application pertains only to the work to be performed by KCC under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c), Local Rule 2002-1(f), and the Claims Agent Protocol, and any work to be performed by KCC outside

---

[11]   *See Application of Sorenson Communications, Inc., et al. for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors, Effective Nunc Pro Tunc to the Petition Date*, filed concurrently herewith.

of this scope is not covered by the application or by any order granting approval thereof. Specifically, KCC will perform, to the extent the Debtors request, the following services in its role as claims and noticing agent, as well as all quality control relating thereto:

a. prepare and serve required notices and documents in the cases in accordance with the Bankruptcy Rules in the form and manner directed by the Debtors and/or the Court, including, if applicable (i) notice of the commencement of the cases, (ii) notices of transfers of claims, (iii) notices of objections to claims and objections to transfers of claims, (iv) notices of any hearings on a disclosure statement and confirmation of the Plan, including under Bankruptcy Rule 3017(d), (v) notice of the effective date of any plan, and (vi) all other notices, orders, pleadings, publications, and other documents as the Debtors and/or the Court may deem necessary or appropriate for an orderly administration of these chapter 11 cases;

b. maintain (i) a list of all potential creditors, equity holders, and other parties in interest, and (ii) a "core" mailing list consisting of all parties described in Bankruptcy Rule 2002 and those parties that have filed a notice of appearance under Bankruptcy Rule 9010;

c. maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

d. prepare and file or cause to be filed with the Clerk an affidavit or certificate of service for all notices, motions, orders, other pleadings, or documents served within seven business days of service that includes (i) either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

e. process all proofs of claim received, including those received by the Clerk's Office, and check said processing for accuracy, and maintain the original proofs of claim in a secure area;

f. maintain the official claims register for each Debtor (the "*Claims Register*") on behalf of the Clerk and upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed: (i) the claim number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim (*e.g.*, secured, unsecured, priority, etc.), (vi) the applicable Debtor, and (vii) any disposition of the claim;

43

g.  implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

h.  record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

i.  relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of KCC, not less than weekly;

j.  upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

k.  monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed, and make necessary notations on and/or changes to the Claims Registers;

l.  assist in the dissemination of information to the public and respond to requests for administrative information regarding the cases, as directed by the Debtors and/or the Court, including through the use of a case website and/or call center;

m.  30 days prior to the close of these cases, to the extent practicable, request that the Debtors submit to the Court a proposed Order dismissing KCC and terminating KCC's services upon completion of its duties and responsibilities and upon the closing of these cases;

n.  within seven days' notice to KCC of entry of an order closing the chapter 11 cases, provide to the Court the final version of the Claims Registers as of the date immediately before the close of the cases; and

o.  at the close of these cases, box and transport all original documents, in proper format, as provided by the Clerk's office, to (i) the Federal Archives Record Administration, located at Central Plains Region, 200 Space Center Drive, Lee's Summit, MO 64064, or (ii) any other location requested by the Clerk's office.

65.  The Claims Registers shall be open to the public for examination without charge during regular business hours and on a case-specific website maintained by KCC. KCC shall not employ any past or present employee of the Debtors for work that involves the Debtors' bankruptcy cases.

DOCS_DE:191927.1 80459/001

66. KCC will follow the notice and claim procedures that conform to the guidelines promulgated by the Clerk's Office, section 331 of the Judicial Code, or as it otherwise may be directed by the Court.

## VI. KCC Retention Application Pursuant to Section 327[12]

67. ***Relief Requested.*** The Debtors seek entry of an Order approving the Services Agreement and the Debtors' retention and employment of KCC as Administrative Advisor for the Debtors in connection with these chapter 11 cases and for related relief, effective to the Petition Date. The Application supplements the Debtors' application under 28 U.S.C. § 156(c) discussed above to retain KCC to serve as the claims and noticing agent in these chapter 11 cases, and seeks approval for KCC to perform duties outside the scope of 28 U.S.C. § 156(c).

68. ***Services to be Provided.*** The Debtors seek to retain KCC to provide, among other things, the following bankruptcy Administrative Services, if and to the extent the Debtors request:

a. assist with, among other things, solicitation, balloting, tabulation, and calculation of votes, as well as preparing any appropriate reports, as required in furtherance of confirmation plan(s) of reorganization;

b. generate an official ballot certification and testifying, if necessary, in support of the ballot tabulation results;

c. provide a confidential data room;

d. manage any distributions pursuant to a confirmed plan of reorganization; and

e. provide such other claims processing, noticing, solicitation, balloting, and administrative services described in the Services Agreement, but not included in the Section 156(c) Application, as may be requested from time to time by the Debtors.

---

[12] *See Application of Sorenson Communications, Inc., et al. for Entry of an Order Approving the Retention and Appointment of Kurtzman Carson Consultants LLC as Administrative Advisor for the Debtors, Effective Nunc Pro Tunc to the Petition Date,* filed concurrently herewith.

DOCS_DE:191927.1 80459/001

## VII.   Joint Administration Motion[13]

69.   ***Relief Requested.***   The Debtors seek entry of the Order directing joint administration of the Debtors' chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Sorenson Communications.

70.   ***The Debtors' Corporate Structure.***   The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code and each Debtor's chapter 11 case is pending in the Court.  Thus, the conditions set forth in Bankruptcy Rule 1015(b) for joint administration of these cases are satisfied.  Various Debtors play a role in other Debtors' capital structures, *e.g.*, as guarantors.  Numerous parties have interests in the cases of multiple Debtors.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  Joint administration of these chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's valuable resources.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  No party in interest will be prejudiced by the joint administration of these chapter 11 cases.

## VIII.   Equity Trading Motion[14]

71.   ***Relief Requested.***   The Debtors seek entry of Orders:   (a) approving the Procedures, without prejudice to the Debtors' and/or Requisite Note Holders' right to waive the Procedures, or any term thereof, with respect to any transfer of the Equity Securities; (b) directing that any purchase, sale, or other transfer of the Equity Securities in violation of the

---

[13]   *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases*, filed concurrently herewith.

DOCS_DE:191927.1 80459/001

Procedures is null and void *ab initio*; and (c) scheduling a final hearing on this motion.  In support of this motion, the Debtors respectfully state as follows:

72.   ***The NOLs.***  As of December 31, 2013, the Debtors had NOLs in the amount of approximately $13.6 million.  The Debtors anticipate that utilization of the NOLs in future tax years will generate up to approximately $5.4 million in cash savings from reduced taxes considering an assumed effective tax rate of 40% for the post-emergence company.  The value of the NOLs will inure to the benefit of all of the Debtors' stakeholders.

73.   ***Proposed Procedures for Transfers of the Equity Securities.***  The Procedures are the mechanism by which the Debtors will monitor, and object to, certain transfers of the Equity Securities to ensure preservation of the NOLs.  The Procedures are summarized as follows:[15]

- Any entity that has direct or indirect beneficial ownership of 4.5% or more of the Equity Securities must serve and file a Declaration of Substantial Holder.

- Prior to effectuating any transfer of the Equity Securities that would (a) increase or decrease a Substantial Holder's beneficial ownership, or (b) would result in another entity becoming or ceasing to be a Substantial Holder, the parties to such transaction must serve and file a Declaration of Proposed Transfer.

- The Debtors and the Requisite Note Holders (as such term is defined in the Plan) have 14 calendar days after receipt of a Declaration of Proposed Transfer to object to the proposed transaction.

- If either the Debtors or the Requisite Note Holders timely object, the proposed transaction remains ineffective unless such objection is withdrawn by the Debtors or the Requisite Note Holders, as applicable, or such action is approved by a final order of the Bankruptcy Court that becomes nonappealable.

---

[14]   *See Motion of Sorenson Communications, Inc., et al. for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of Equity Securities,* filed concurrently herewith.

[15]   To the extent that this summary and the terms of the Procedures are inconsistent, the terms of the Procedures control.

47

DOCS_DE:191927.1 80459/001

- If neither the Debtors nor the Requisite Note Holders object, the proposed transaction may proceed solely as described in the Declaration of Proposed Transfer.

- The Debtors will serve notice of the Interim Order or the Final Order (as applicable) and the Procedures upon all parties in interest, including all registered holders of the Equity Securities.

- Any transfer of the Equity Securities in violation of the Procedures is null and void *ab initio*.

74. As of the Petition Date, the Debtors' ultimate parent company was closely held by primarily two financial sponsors.

## IX.   Disclosure Statement Scheduling Motion[16]

75.   ***Relief Requested.***   The Debtors seek entry of the Order: (a) scheduling the Confirmation Hearing; (b) establishing the Objection Deadline and approving related procedures; (c) approving the Solicitation Procedures; (d) approving the form and manner of distributing the Notice; and (e) directing that the U.S. Trustee not convene the Creditors' Meeting if the Plan is confirmed within 75 days of the Petition Date, and for certain related relief.

76.   In connection with the foregoing, the Debtors seek that the Order approve the following schedule of proposed dates:

| Event | Date[17] |
| --- | --- |
| Voting Record Date[18] | February 18, 2014 |
| Start of Solicitation | February 27, 2014 |
| Voting Deadline[19] | March 20, 2014 |

---

[16]   *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Confirmation Hearing Notice, and (E) Directing that a Meeting of Creditors Not Be Convened,* filed concurrently herewith.

[17]   Proposed dates are subject to the Court's availability.

[18]   The "***Voting Record Date***" is the date as of which a holder of record of a claim or an interest entitled to vote on the Plan must have held such claim or interest to cast a vote to accept or reject the Plan.

| Event | Date[17] |
|-------|------|
| Petition Date | March 3, 2014 |
| Notice Date | March 6, 2014 |
| Objection Deadline | April 3, 2014 |
| Reply Deadline | April 7, 2014 |
| Confirmation Hearing | April 10, 2014 |

77.    *The Solicitation Procedures.*  The Debtors commenced solicitation of holders of claims and interests regarding the Plan prior to the Petition Date in accordance with the following Solicitation Procedures and the Bankruptcy Code.  On February 27, 2014, the Debtors caused their solicitation agent, KCC, to distribute the Solicitation Packages containing the Disclosure Statement, the Plan, and ballots to holders of claims and interests as of the Voting Record Date entitled to vote to accept or reject the Plan.  KCC transmitted the Solicitation Packages to holders of claims (or their respective nominees) by overnight mail or courier and to holders of interests by overnight mail.  Holders of claims and interests to whom the Solicitation Packages were transmitted were directed in the Disclosure Statement and ballots to follow the instructions contained in the ballots (and described in the Disclosure Statement) to complete and submit their respective ballots to cast a vote to accept or reject the Plan.  Each holder was explicitly informed in the Disclosure Statement and applicable ballot that such holder needed to submit its ballot such that it is actually received by KCC by the Voting Deadline to be counted.  Certain holders of claims and interests were not provided a Solicitation Package because such holders are:  (a) unimpaired under, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code; or (b) impaired, entitled to receive no distribution on account of such claims or interests under the Plan, and therefore deemed to have rejected the Plan under

---

[19]    The "*Voting Deadline*" is the date and time by which a holder of a claim or an interest entitled to vote to accept or reject the Plan must have submitted its ballot casting its vote, as more fully described in the motion.

49

section 1126(g) of the Bankruptcy Code. The Debtors expect to complete a final tabulation of the ballots on or about March 25, 2014. The Debtors' procedures and standard assumptions for tabulating ballots include:

| | |
|---|---|
| **Votes Not Counted** | – any ballot that was illegible or contained insufficient information to permit the identification of the holder of the claim or the interest<br>– any ballot not actually received by KCC by the Voting Deadline<br>– any unsigned ballot<br>– any ballot that did not contain an original signature<br>– any ballot that partially rejected and partially accepted the Plan<br>– any ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan<br>– any ballot superseded by a later, timely submitted valid ballot |
| **No Vote Splitting** | – holders were required to vote all of their claims or interests within a particular class either to accept or reject the Plan and were not permitted to split any votes |
| **Establishing Claim Amounts and Number of Shares** | – claim amounts and the number of shares held by a holder, as applicable, were pre-populated in the ballots. The Debtors determined these amounts as of the Voting Record Date based on their books and records |

## X.   Schedules Waiver and Consolidated List of Creditors Motion[20]

78.   ***Relief Requested.*** The Debtors seek entry of the Order (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "***Schedules and Statements***") through and including May 2, 2014 (the "***Deadline***"), and (c) waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of the Plan if confirmation occurs on or before the Deadline.

---

[20]   *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order (A) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) Extending the Time, and, Upon Plan Confirmation, Waiving the Requirement, to File Schedules and Statements of Financial Affairs,* filed concurrently herewith.

50

79.    ***The Debtors' List of Creditors.***  The Debtors have thousands of creditors.  The ordinary operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.  Maintaining a single consolidated list of creditors will therefore benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.  Accordingly, substantial time would be required for the Debtors to complete the Schedules and Statements.

## XI.    Taxes Motion[21]

80.    ***Relief Requested.***  The Debtors seek entry of the Order authorizing the Debtors to pay certain accrued and outstanding prepetition taxes, fines, and refunds.

81.    ***The Taxes.***  The Debtors incur and remit use, property, gross receipts, business, and various other taxes, and pay certain regulatory fees, fines, and refunds (each a *"Tax"* and collectively, the *"Taxes"*).  The Debtors remit the Taxes to applicable taxing authorities (each an *"Authority"* and collectively, the *"Authorities"*), a list of which is attached to the motion, in the ordinary course of business and in accordance with all applicable laws and regulations.  As of the Petition Date, the Debtors believe that they have timely filed all applicable returns for the Taxes.

82.    The following table contains descriptions of the Taxes, as well as the Debtors' estimate of the amounts of the Taxes accrued as of the Petition Date and, of those amounts, the amounts that will become payable in the ordinary course within 45 days of the Petition Date:

---

[21]    *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order Authorizing the Payment of Certain Prepetition Taxes,* filed concurrently herewith.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Use Tax | The Debtors incur and remit a use tax for business conducted in Utah. | $300,000 | $300,000 |
| Personal Property Tax | The Debtors incur and remit personal property taxes in approximately 50 state, city, and county jurisdictions. | $260,000 | $220,000 |
| Gross Receipts Tax | The Debtors incur and remit gross receipts taxes in Washington, New Mexico, and Ohio. | $80,000 | $80,000 |
| Income and Franchise Taxes | The Debtors pay estimated annual state and local income and franchise taxes, as well as federal income taxes, in advance on a quarterly basis. On account of underpayment for calendar year 2013 and for calendar year 2014, the Debtors expect to pay in aggregate approximately $11 million for such taxes on or before April 15, 2014. | $11,000,000 | $11,000,000 |
| Business Licenses | The Debtors maintain a variety of business licenses in approximately 75 state, city, and county jurisdictions necessary to operate their businesses. | $22,500 | $16,000 |
| FCC Refunds / Offsets and Fines | In the ordinary course, the FCC periodically audits the Debtors and asks the Debtors to investigate possible rule violations and/or FCC billing discrepancies. As part of their internal controls, the Debtors also periodically audit their own billing submissions and monitor their compliance with FCC rules and minimum standards. If the Debtors discover a billing discrepancy, the Debtors will submit a corrected billing statement to the FCC and any overpayments will either be refunded to the FCC or offset against future reimbursements. Pursuant to a consent decree entered into between the FCC and the Debtors resolving an investigation into their implementation of certain FCC user registration and verification requirements, the Debtors must make a voluntary contribution to the U.S. Treasury in the amount of $5,255,000 on or before May 1, | $5,255,000 | $0 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | 2014. | | |
| | The Debtors do not anticipate that any other liabilities will arise from such audits during the pendency of their cases. For the avoidance of doubt, however, if any such liability does arise, the Debtors seek authority to satisfy the liability in the ordinary course of business. | | |
| **Total** | | **$16,917,500** | **$11,616,000** |

## XII. Utilities Motion[22]

83. *Relief Requested.* The Debtors seek entry of Orders: (a) prohibiting Utility Providers from altering or discontinuing services; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures, if needed, for resolving requests for additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the utility providers.

84. *The Utility Providers.* The Debtors incur utility expenses in the ordinary course of business for, among other things, water, waste, electricity, gas, local and long-distance telephone service, data service, and other similar services in connection with the operation of their businesses. The Debtors spent an average of approximately $1,395,774 each month on Utility Services during 2013. Over 80 utility providers located throughout the United States, including Puerto Rico, and Canada provide the Utility Services to the Debtors at the Debtors'

---

[22] *See Motion of Sorenson Communications, Inc., et al. for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Providers Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment,* filed concurrently herewith.

DOCS_DE:191927.1 80459/001

offices, warehouses, service centers, or other locations, with many such Utility Providers providing services at multiple locations.

85.     *The Proposed Adequate Assurance.*  The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses.  The Debtors expect that their cash flows from operations and cash on hand will be sufficient to pay postpetition obligations related to the Utility Services. Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit $697,887 (the "*Adequate Assurance Deposit*") into a newly created, segregated, interest-bearing account (the "*Adequate Assurance Account*") within 20 days of the Petition Date for the benefit of the Utility Providers, pending further order of the Court.  The amount of the Adequate Assurance Deposit equals approximately 50% of the Debtors' average monthly cost of Utility Services during 2013.

86.     The creation and maintenance of the Adequate Assurance Account, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (together, the "*Proposed Adequate Assurance*"), constitutes sufficient adequate assurance to the Utility Providers under section 366 of the Bankruptcy Code.  These protections ensure that all Utility Providers will have adequate assurance of payment throughout these cases, and the Debtors believe, and I agree, that no other or further assurance is necessary.  However, if any Utility Provider believes adequate assurance is required beyond the protections described herein, the Debtors submit that such provider must request assurance pursuant to the procedures described below.

DOCS_DE:191927.1 80459/001

87.    ***Proposed Procedures for Additional Adequate Assurance Requests.***  In light of the severe consequences that any interruption of the Debtors' Utility Services would have on their businesses and reorganization process, while at the same time recognizing the Utility Providers' right to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtors propose that the Court approve and adopt the following procedures (the "***Adequate Assurance Procedures***"):

a.  The Debtors shall serve a copy of the motion, the Interim Order, the Adequate Assurance Procedures, the Utility Service List, and a notice of the final hearing on each Utility Provider listed on the Utility Service List no later than two business days after the date the Interim Order is entered.

b.  If a Utility Provider is not satisfied with the Proposed Adequate Assurance, the Utility Provider must serve a request for additional adequate assurance (an "***Additional Assurance Request***") so that it is received by the Debtors and counsel to the ad hoc group of senior secured note holders at the following addresses:  (i) Sorenson Communications, Inc., 4192 South Riverboat Road, Salt Lake City, Utah 84123, Attn.  Scott Sorensen; (ii) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654, Attn.  Noah Ornstein; (iii) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn.  Laura Davis Jones and Timothy P. Cairns; and (iv) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn. Ira S. Dizengoff and Meredith A. Lahaie.

c.  Any Additional Assurance Request must:  (i) be in writing; (ii) set forth the location(s) for which Utility Services are provided; (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits; and (iv) set forth why the Utility Provider believes that the Proposed Adequate Assurance is not sufficient assurance of future payment.

d.  Upon the Debtors' receipt of an Additional Assurance Request, the Debtors shall have the greater of (i) 20 days from the receipt of the Additional Assurance Request or (ii) 30 days from the Petition Date (collectively, the "***Resolution Period***") to negotiate with the Utility Provider to resolve the Utility Provider's Additional Assurance Request.

e.  Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving an Additional Assurance Request, if the Debtors, in consultation with the

55

Requisite Note Holders (as such term is defined in the Plan), determine that the Additional Assurance Request is reasonable.

f.  If the Debtors, in consultation with the Requisite Note Holders, determine that the Additional Assurance Request is not reasonable, and are not able to reach an agreement with the Utility Provider, the Debtors, during or immediately after the Resolution Period, will request a hearing before the Court to determine the adequacy of assurance of payment with respect to that Utility Provider pursuant to section 366(c)(3) of the Bankruptcy Code. Such hearing will be without prejudice to the right of any Utility Provider to seek relief separately under section 366(c)(3) of the Bankruptcy Code (any hearing requested by the Debtors or a Utility Provider, a "*Determination Hearing*").

g.  Pending resolution of such dispute at a Determination Hearing, the relevant Utility Provider shall be restrained from altering, refusing, or discontinuing service to the Debtors.

h.  The Proposed Adequate Assurance shall be deemed adequate assurance of payment for any Utility Provider that fails to make an Additional Assurance Request.

i.  The Adequate Assurance Deposit requested by, and deposited into the Adequate Assurance Account on behalf of, any Utility Provider shall be returned to the Debtors upon (i) confirmation of the Plan or (ii) the Debtors providing notice to a Utility Provider that services provided to the Debtors by such Utility Provider no longer will be needed.

88.    Absent compliance with the Adequate Assurance Procedures, the Debtors request that the Utility Providers, including subsequently added Utility Providers, be forbidden from altering, refusing, or discontinuing service, or requiring additional assurance of payment other than the Proposed Adequate Assurance.

## XIII.  Wages and Benefits Motion [23]

89.    *Relief Requested.* The Debtors seek entry of the Order authorizing them, in their sole discretion, to pay prepetition claims and honor obligations, and continue programs, as applicable, in the ordinary course of business relating to: (a) wages, salaries, and other

---

[23]   *See Motion of Sorenson Communications, Inc., et al. for Entry of an Order Authorizing Payment of Certain Prepetition (A) Wages, Salaries, and Other Compensation, (B) Reimbursable Employee Expenses, (C) Employee Benefits, and (D) Related Costs,* filed concurrently herewith.

DOCS_DE:191927.1 80459/001

compensation; (b) reimbursable employee expenses; (c) employee benefits; and (d) related costs (collectively, the "*Obligations*"), as more fully described in the motion.

90.     *The Obligations.* As of January 1, 2014, the Debtors employed approximately 6,800 hourly and salaried Employees and fewer than 15 temporary or Contract Workers. Approximately 6,220 of the Employees are hourly, the vast majority of whom are interpreters and communications assistants that are core to the Debtors' services.   The Debtors' approximately 545 salaried Employees provide management, engineering, and administrative support in connection with the Debtors' services.  Additionally, the Debtors contract with the Contract Workers for services including but not limited to information technology and engineering services as needed.

91.     The Obligations owed to the Employees include compensating them for services rendered to the Debtors, reimbursing certain of their business expenses, and paying for their health and related benefits.

92.     The following table contains descriptions of the Obligations and the Debtors' estimate of the amounts of the Obligations outstanding as of the Petition Date and, of those amounts, the amounts that are due in the ordinary course of business within 45 days of the Petition Date:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
| --- | --- | --- | --- |
| Wages | The Debtors typically pay the Employees on a semi-monthly basis.  On average, the Debtors pay wages of approximately $6,082,150 per pay period in aggregate for all Employees.  Certain wages accrued in the ordinary course of business as of the Petition Date and remain unpaid.  And certain Employees may be entitled to unpaid wages because of:  (a) discrepancies | $7,298,581 | $7,298,581 |

57

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | between amounts actually paid versus required to be paid and (b) checks issued before the Petition Date that were not presented for payment or did not clear the Debtors' cash management system before the Petition Date.<br><br>These wages include a variety of incentives the Debtors offer to the Employees who install the Debtors' equipment at the users' location and train users in the usage of such equipment. Such incentives include piece rate bonuses for installations, replacements and upgrades, and periodic promotional programs designed to give incentives to the user-facing staff. [24] | | |
| Payroll Costs | The Debtors pay approximately 98% of the Employees by direct deposit and the remaining Employees by check. For U.S. Employees, the Debtors process the direct deposit transfers to the Employees through JPMorgan Chase. For Canadian Employees, Ceridian Corporation ("*Ceridian*") processes the Debtors' payroll and its payroll taxes for both the U.S. and Canada. The Debtors pay Ceridian approximately $5,000 per month for its services.[25] | $5,000 | $5,000 |
| Deductions | The Debtors routinely deduct certain amounts from their Employees' compensation that represent earnings that judicial authorities or the Employees have designated for deduction, including, for example, garnishments, child | $662,015 | $662,015 |

---

[24] The Debtors also provide a Management Bonus Option for approximately 400 Employees, including 9 insiders. Bonus payments are payable as a percentage of base salary and are based on the achievement of certain targeted performance metrics of the Debtors for a given quarter, as well as specific personal objectives set for each Employee, with the first quarter bonus payment to be made on or around April 25, 2014. The Debtors owe $0 on account of these bonus payments as of the Petition Date, and therefore describe such plan herein only in the interest of full disclosure. For the avoidance of doubt, the Debtors will not seek to make payment of bonuses to insiders during the pendency of the cases without further court order.

[25] The Debtors pay approximately $6,000 a month in fees to JPMorgan Chase on account of transaction fees, including fees related to payroll. Contemporaneous with this motion, the Debtors have filed the *Motion of Sorenson Communications, Inc., et al. for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Current Investment Practices, and (D) Maintain Existing Business Forms*, in which the Debtors have sought authority to pay such fees to JPMorgan Chase.

DOCS_DE:191927.1 80459/001

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | support and similar deductions, and other pre-tax and after-tax deductions payable pursuant to certain Employee benefit plans. The Debtors have no legal interest in the deductions and forward these deducted amounts to various third-party recipients. The deductions are not property of the Debtors' estates. | | |
| | The Debtors also deduct certain amounts in connection with the medical, dental, and vision plans, employee contributions to their 401(k) plans, contributions to flexible spending accounts, supplemental life and accidental death and dismemberment premiums ("*AD&D*"), and section 132 plans where applicable; all of which are offered to the Employees. Generally, the Employees are responsible for 22% of the medical and dental plan premiums, and the Employees are responsible for 100% of the vision plan premiums, supplemental life and AD&D premiums, contributions to their 401(k) plan, and flexible spending plans. | | |
| | On a semi-monthly basis, the Debtors deduct approximately $680,166 in aggregate from Employees' pay on account of these deductions. | | |
| Withholdings and Payroll Taxes | The Debtors are required by law to withhold from their Employees' pay amounts related to federal, state, and local income taxes, Social Security, state disability insurance, school district taxes, and Medicare taxes. Further, federal and state laws require the Debtors to deduct additional amounts on account of state unemployment insurance. The Debtors calculate the payroll and tax obligations for each Employee and then transfer these amounts to Ceridian following the end of the applicable payroll period. Ceridian remits these amounts to the appropriate federal, state, or local authority. On a semi-monthly basis, these withheld amounts equal approximately $1,771,250 in the aggregate. | $3,163,871 | $3,163,871 |
| | Also, the Debtors incur payroll employment taxes for Social Security, Medicare, and federal and state unemployment assessments. The | | |

59

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | Debtors are obligated to pay other state and local employer taxes, including various states' disability and workers compensation taxes as applicable. On a semi-monthly basis, these taxes are approximately $865,308 in aggregate. | | |
| Contract Worker Pay | The Contract Workers include independent contractors and individuals hired through various staffing vendors. The Debtors remit compensation to the appropriate staffing vendor, which in turn pays the respective Contract Worker, or the Debtors pay the Contract Workers directly. On average, the Debtors pay a total of less than $40,000 per month on account of the Contract Workers. | $60,000 | $60,000 |
| Travel Expenses and Corporate Credit Card Program | The Debtors directly reimburse Employees for certain approved, reasonable expenses incurred in the scope of their employment and for which they have an expectation of being reimbursed. Certain of the Employees use American Express corporate credit cards to pay for their reasonable expenses, the invoices of which are sent to the Employees; however, the Debtors directly pay American Express. Reimbursable expenses include, for example, business-related travel expenses, such as meals, hotels, flights, mileage, car rentals, and other related expenses. On average, the Debtors pay $725,000 per month in reimbursable expenses. The Employees bear personal liability for charges on the American Express corporate credit cards. | $942,500 | $942,500 |
| Health Care Coverage and Other Insurance | Full-time Employees are eligible for health care coverage beginning on the thirty-first day after commencing employment (or on their first day of employment with respect to salaried Employees). The Debtors provide these Employees with medical insurance, including prescription drug benefit coverage, dental insurance, vision insurance, and flexible spending accounts. Certain of the dental plans are self-insured, in which case the Debtors pay a third-party administrator to administer the plan, and the Debtors are responsible for the costs of related Employee claims. Other plans | $203,936 | $203,936 |

60

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | are fully-insured, meaning that the Debtors pay the insurance carrier a set premium on a monthly basis, and the insurance carrier pays the Employees' claims based on the applicable policy terms. Enrollment in each of the various health care options is optional. | | |
| | The Debtors' sponsored health and welfare benefits continue until the end of the month in which an Employee terminates his or her employment. The Employee and his or her enrolled dependents have the right to continue (as defined by law) medical, dental, vision, and flexible savings accounts coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("*COBRA*") for approximately 18 months. | | |
| | The Debtors spend approximately $950,000 per month for the Employees' health care coverage, which includes administrative fees. For U.S. Employees not located in Puerto Rico, the Debtors pay UnitedHealthcare Insurance Company approximately $1.2 million a month in connection with the medical plans, and the Debtors pay Delta Dental Insurance Company and Dental Select approximately $75,000 annually in connection with the dental plans. The Debtors believe there are approximately $65,000 in accrued but unpaid self-insured dental claims. Although the Debtors offer vision insurance, the Employees are responsible for 100% of the costs thereof. | | |
| | For Employees in Puerto Rico, the Debtors pay Triple-S, Inc. approximately $6,000 per month in connection with the health, dental, and vision plans. For Employees in Canada, the Debtors pay SunLife Financial of Canada ("*SunLife*") approximately $15,000 per month in connection with the health, dental, and vision plans. | | |
| | The Debtors provide a number of different types of additional insurance benefits to their existing Employees, including voluntary life and AD&D, business travel accident, short-term disability, and long-term disability. Such insurance plans are fully insured, meaning that | | |

61

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | the Debtors pay the insurance carrier a set premium on a monthly basis, and the insurance carrier pays the Employees' claims based on the applicable policy terms. | | |
| | For U.S. Employees, the Debtors pay Cigna Insurance Company approximately $51,000 per month for such additional benefits. For Employees in Puerto Rico and Canada, the amounts paid to Sunlife and Triple-S, Inc., include payment on account of the additional benefits. | | |
| Workers' Compensation | The Debtors provide workers' compensation insurance for the Employees at the statutorily required level for each state. The Debtors are insured through Travelers Property and Casualty Insurance Company ("*Travelers*") and pay annual insurance premiums. Also, in accordance with applicable state law, the Debtors pay Travelers to provide workers' compensation coverage to the Employees under state-administered workers' compensation programs. | $364,014 | $364,014 |
| Vacation Time and Sick Leave Pay | The Debtors provide a time off with pay program for full-time Employees to use for their vacation, personal, and sick leave, generally at their regular daily rate of pay. Such pay accrues daily up to a maximum annual accrual of 9 to 18 days, depending on length of service and job category. Eligible Employees are permitted to carry over hours each calendar year. Also, the Employees are eligible to receive pay on certain holidays. The Debtors estimate that approximately $5.2 million in earned but unused time off with pay has accrued as of the Petition Date. However, this accrued amount is not a current cash payment obligation, as the Employees are only entitled to cash payments for all accrued and unused vacation time upon termination of employment. Moreover, the Debtors anticipate that the Employees will utilize any accrued time off with pay in the ordinary course of business, which will not create any material cash flow requirements | $5,218,979 | $30,000 |

62

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | beyond the Debtors' normal payroll obligations. | | |
| Retirement Savings Plans | The Debtors maintain retirement savings plans for the benefit of eligible Employees in the U.S. meeting the requirements of section 401(k) of the Internal Revenue Code, on account of which it deducts amounts from the Employees' pay. The Debtors contribute a 100% match on the first 4% for non-Puerto Rican U.S. Employees and 5% for Employees in Puerto Rico and Canada of annual salary invested by each Employee in the savings plans. All Employees are entitled to the matching payments after one full year of employment and 1,000 hours of service in the calendar year, and each subsequent year of employment. The Employee must be employed as of December 31 of the previous year in order to be eligible to receive their matching contribution for the year (Employees in Canada and Puerto Rico are excepted from this requirement). The Debtors' matching contributions fully vest for the Employees after five full years of service. Thus, an Employee's contributed funds, any fully-vested matching funds, and interest earned belong to the Employee. The Debtors deduct the Employees' contributions from payroll. | $34,923 | $34,923 |
| | Approximately 4,000 Employees currently participate in the savings plans. During 2013, the Debtors contributed approximately $5,400,000 to the savings plans. | | |
| | The Debtors pay Merrill Lynch approximately $7,000 each quarter to administer the retirement savings plan for the benefit of the non-Puerto Rican U.S. Employees. And the Debtors pay UBS AG approximately $1,600 each quarter to administer the retirement savings plan for the benefit of Employees in Puerto Rico. For Employees in Canada, the Debtors pay Great West Life Assurance Company approximately $5,500 annually to administer the retirement plan offered to such Employees. | | |
| Relocation | From time to time, the Debtors in their discretion provide certain relocation assistance | $3,000 | $3,000 |

DOCS_DE:191927.1 80459/001

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Assistance | to qualifying Employees.  The Debtors have paid and may pay *de minimis* amounts in connection with such assistance. | | |
| Employee Assistance Program | The Debtors provide Employees with counseling and other personal services.  For U.S. Employees, the Debtors pay UnitedHealth and OptumRx, Inc. approximately $600 per month for such programs.  For Employees in Canada, the Debtors pay Shepell Morneau, Ltd. approximately $1,256 per month for such services.<br><br>Additionally, the Debtors are currently within a six-month trial period of an additional employee assistance program for their interpreters.  Eligible Employees receive support for coping with vicarious trauma that such Employees may witness while communicating with a user via a video connection.  The Debtors pay Resiliency Resources approximately $4,500 per month for such program. | $5,500 | $5,500 |
| Insurance Brokers | In connection with certain of the insurance benefits discussed above, the Debtors employ the services of Group Benefit Services, Inc. (*"GBS"*) and Marsh LLC (*"Marsh"*) as brokers for the Debtors' benefits plans and workers' compensation insurance, respectively.  The Debtors pay GBS approximately $24,000 per year and Marsh approximately $182,000, which amount includes premiums paid to Travelers on account of workers' compensation insurance, per year in connection with such brokerage services. | $7,200 | $0 |
| **Total** | | **$17,969,519** | **$12,773,340** |

93.    As of the Petition Date, no Employee of the Debtors was owed unpaid cash and cash equivalent compensation in excess of the cap of $12,475 set forth in section 507(a)(4) of the Bankruptcy Code.

64

94.     The Debtors also seek the authority to pay non-salary cash compensation only to non-insiders. Specifically, the Debtors offer certain Employees piece-rate bonuses and other fringe benefits on account of such Employees' performance. To be sure, the Debtors are not seeking the authority to make bonus, severance, or retention payments to any "insiders" (as that term is defined in section 101(31) of the Bankruptcy Code) during the cases. To the extent the Debtors propose to make such payments to any insiders during the cases, the Debtors will seek approval of such payments in a separate motion prior to making any such payments. Finally, the Debtors request authority to re-issue checks to the Employees on account of the Obligations that were issued but not cashed prior to the Petition Date.

DOCS_DE:191927.1 80459/001

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 3, 2014                                Respectfully submitted,

                                                    _____
                                                    Scott Sorensen
                                                    Chief Financial Officer
                                                    Sorenson Communications, Inc.
                                                    4192 South Riverboat Road
                                                    Salt Lake City, Utah 84123